United States District Court
Southern District of Texas
**ENTERED**
September 18, 2020
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| U.S. WELL SERVICES, LLC, | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 3:19-CV-00237 |
| | § | |
| TOPS WELL SERVICES, ET AL., | § | |
| | § | |
| Defendants. | § | |

## REPORT AND RECOMMENDATION AND ORDER

This case has been referred to me for all pretrial purposes pursuant to 28 U.S.C. §

636. On June 11, 2020, I conducted a hearing pursuant to *Markman v. Westview*

*Instruments Inc.*, 517 U.S. 370 (1996) (the "Markman hearing"). During the Markman

hearing, the parties presented arguments in support of their proposed constructions of the

disputed terms in United States Patent Nos. 9,410,410 (the "'410 Patent"), 8,789,601 (the

"'601 Patent"), 9,611,728 (the "'728 Patent"), 9,970,278 (the "'278 Patent"), and

10,337,308 (the "'308 Patent") (collectively, the "Asserted Patents"). I have fully

considered the parties' claim construction arguments made during the Markman hearing

and those contained in the parties' briefs. *See* Dkts. 72, 78, 86. I have also considered the

parties' arguments concerning Defendants' Motion for Summary Judgment of Invalidity

Under 35 U.S.C. § 112 (the "Motion"). *See* Dkts. 73, 90, 94. After carefully reviewing all

the briefing, evidence, arguments, and applicable law, I adopt the constructions set forth

below and **RECOMMEND** that the Motion be **GRANTED IN PART** and **DENIED IN**

PART in accordance with this Report and Recommendation and Order.[1]  Appendix A summarizes my conclusions on both the claim construction and summary judgment issues.

## I.    BACKGROUND

U.S. Well Services, LLC ("USWS") owns the Asserted Patents, which cover systems that use electricity to power hydraulic fracking operations.  The claimed systems generally include: (i) a pump that uses electricity as a power source; (ii) an electric motor that is coupled to, and that supplies mechanical power to, the pump; (iii) a variable frequency drive ("VFD") that drives the electric motor and controls the speed and torque of the motor; and (iv) a generator that supplies electric power to the system.  USWS sued TOPS Well Services, LLC and Honghua America, LLC (collectively, "Defendants") for allegedly manufacturing, selling, and/or using electric powered fracturing systems that infringe USWS's patented systems.

The '410 Patent is titled "System for Pumping Hydraulic Fracturing Fluid Using Electric Pumps."  The '601 Patent is titled "System for Pumping Hydraulic Fracturing Fluid Using Electric Pumps."  The '601 Patent is a continuation-in-part of the '410 Patent, and both patents generally share a common specification as it relates to the disputed terms.  The '601 and '410 Patents describe connections between various components that facilitate the flow of electricity to power the electric fracking system.  The Abstract of the '410 Patent states the following:

> A system for hydraulically fracturing an underground formation in an oil

---

[1] Claim construction is a non-dispositive, pretrial issue appropriate for an order.  *See SciCo Tec GmbH v. Boston Sci. Corp.*, 599 F. Supp. 2d 741, 742 (E.D. Tex. 2009).  A motion for summary judgment is a dispositive motion appropriate for a Report and Recommendation.

or gas well to extract oil or gas from the formation, the oil or gas well having a wellbore that permits passage of fluid from the wellbore into the formation. The system includes a plurality of electric pumps fluidly connected to the well, and configured to pump fluid into the wellbore at high pressure so that the fluid passes from the wellbore into the [formation] and fractures the formation. The system can also include a plurality of natural gas powered generators electrically connected to the plurality of electric pumps to provide electrical power to the pumps.

Dkt. 72-3 at 2.  Claim 1 of the '410 Patent is an illustrative claim and recites the following

elements (disputed terms in italics):

1. A system for hydraulically fracturing an underground formation in an oil or gas well to extract oil or gas from the formation, the oil or gas well having a wellbore that permits passage of fluid from the wellbore into the formation, the system comprising:
a plurality of electric pumps fluidly *connected to* the well and powered by at least one electric motor, and *configured to pump fluid into the wellbore at high pressure so that the fluid passes from the wellbore into the formation, and fractures the formation*; and
a variable frequency drive *connected to* the electric motor to control the speed of the motor, wherein the variable frequency drive *frequently performs electric motor diagnostics* to prevent damage to the at least one electric motor.

*Id.* at 8 (7:19–33).

The '728 Patent is titled "Cold Weather Package for Oil Field Hydraulics."  The

'728 Patent is a continuation-in-part of the '410 Patent.  The '728 Patent is directed to a

heater system that improves operations in cold weather.  The Abstract of the '728 Patent

states the following:

A hydraulic fracturing system includes an electrically powered pump that pressurizes fluid, which is piped into a wellbore to fracture a subterranean formation.  System components include a fluid source, an additive source, a hydration unit, a blending unit, a proppant source, and a fracturing pump. The system includes heaters for warming hydraulic fluid and/or lube oil.  The hydraulic fluid is used for operating devices on the blending and hydration units.   The lube oil lubricates and cools various moving parts on the

fracturing pump.

Dkt. 72-4 at 2.  Claim 1 of the '728 Patent is an illustrative claim and recites the following

elements (disputed terms in italics):

> 1. A hydraulic fracturing system for fracturing a subterranean formation comprising:
> a plurality of electric pumps fluidly connected to the well and powered by at least one electric motor, and *configured to pump fluid into the wellbore at high pressure so that the fluid passes from the wellbore into the formation, and fractures the formation*;
> a variable frequency drive connected to the electric motor to control the speed of the motor, wherein the variable frequency drive *frequently performs electric motor diagnostics* to prevent damage to the at least one electric motor; and
> a working fluid system comprising working fluid, and a heater that is in thermal contact with the working fluid;
> wherein the heater comprises a tank having working fluid and a heating element in thermal contact with the working fluid.

*Id.* at 12 (8:22–38).

The '278 Patent is titled "System for Centralized Monitoring and Control of Electric

Powered Hydraulic Fracturing Fleet."  The '278 Patent is a continuation-in-part of the '410

Patent.   The '278 Patent discloses systems to control and monitor electric fracking

equipment from a centralized location on the well site.  The Abstract of the '278 Patent

states the following:

> A system and method are disclosed for centralized monitoring and control of a hydraulic fracturing operation.  The system includes an electric powered fracturing fleet and a centralized control unit coupled to the electric powered fracturing fleet.   The electric powered fracturing fleet can include a combination of one or more of: electric powered pumps, turbine generators, blenders, sand silos, chemical storage units, conveyor belts, manifold trailers, hydration units, variable frequency drives, switchgear, transformers, and compressors.   The centralized control unit can be configured to monitor and/or control one or more operating characteristics of the electric powered fracturing fleet.

4

Dkt. 72-5 at 2.  Claim 1 of the '278 Patent is an illustrative claim and recites the following elements (disputed terms in italics):

> 1. A system for hydraulically fracturing an underground formation in an oil or gas well to extract oil or gas from the formation, the oil or gas well having a wellbore that permits passage of fluid from the wellbore into the formation, the system comprising:
> a plurality of electric pumps fluidly connected to the well, and *configured to pump fluid into the wellbore at high pressure so that the fluid passes from the wellbore into the formation, and fractures the formation*;
> a plurality of generators *electrically connected to the plurality of electric pumps to provide electrical power to the electric pumps*; and
> a centralized control unit coupled to the plurality of electric pumps and the plurality of generators, wherein *the centralized control unit is configured to*:
> *monitor at least one of pressure and temperature of the plurality of electric pumps and the plurality of generators*.

*Id*. at 18 (21:37–54).

The '308 Patent is titled "System for Pumping Hydraulic Fracturing Fluid Using Electric Pumps."  The '308 Patent is a continuation of the '410 Patent.  The '308 Patent is generally directed to the specific configurations and parameters of pumps and motors used in the system.  The Abstract of the '308 Patent states the following:

> A system for hydraulically fracturing an underground formation in an oil or gas well to extract oil or gas from the formation, the oil or gas well having a wellbore that permits passage of fluid from the wellbore into the formation. The system includes a plurality of electric pumps fluidly connected to the well, and configured to pump fluid into the wellbore at high pressure so that the fluid passes from the wellbore into the, and fractures the formation.  The system can also include a plurality of natural gas powered generators electrically connected to the plurality of electric pumps to provide electrical power to the pumps.

Dkt. 72-6 at 2.  Claim 1 of the '308 Patent is an illustrative claim and recites the following elements (disputed terms in italics):

> 1. A system for hydraulically fracturing an underground formation in an oil or gas well to extract oil or gas from the formation, the oil or gas well having a wellbore that permits passage of fluid from the wellbore into the formation, the system comprising:
> a pump fluidly connected to the well; and
> an electric motor to power the pump;
> the pump *configured to pump fluid into the wellbore at high pressure so that the fluid passes from the wellbore into the formation, and fractures the formation*, wherein the pump is a triplex or a quinteplex pump rated at about 2250 hydraulic horsepower or more.

*Id.* at 11 (7:36–8:9).

## II.    APPLICABLE LAW

The United States Supreme Court has held that the construction of patent claims is a matter of law exclusively for the court to decide. *See Markman*, 517 U.S. at 372 ("[T]he construction of a patent, including terms of art within its claim, is exclusively within the province of the court."). The goal of a Markman hearing is to arrive at the ordinary and customary meaning of a claim term in the eyes of a person of ordinary skill in the art. *See Phillips v. AWH Corp.*, 415 F.3d 1301, 1313 (Fed. Cir. 2005). The general legal principles governing the claim construction process are detailed below.

### A.    Claim Construction

"It is a 'bedrock principle' of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips*, 415 F.3d at 1312 (internal quotation marks and citation omitted). To determine the meaning of the claims, I must start by considering the intrinsic evidence. *See id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at

1314; *C.R. Bard, Inc.*, 388 F.3d at 861.  The general rule—subject to certain specific exceptions discussed below—is that each claim term is construed according to its plain and ordinary meaning as understood by a person of ordinary skill in the art ("POSITA") at the time of the invention in the context of the patent.  *See Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014), *vacated on other grounds*, 135 S. Ct. 1846 (2015) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.").

"The claim construction inquiry . . . begins and ends in all cases with the actual words of the claim."  *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998).  "[I]n all aspects of claim construction, the name of the game is the claim."  *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (internal quotation marks and citation omitted).  A term's context in the asserted claim can be instructive.  *See Phillips*, 415 F.3d at 1314.  Other asserted or unasserted claims often aid in determining the claim's meaning, because claim terms are typically used consistently throughout the patent.  *See id.*  Differences among the claim terms can also assist in understanding a term's meaning.  *See id.*  For example, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim."  *Id*. at 1315.

"[C]laims must be read in view of the specification, of which they are a part."  *Id*. (quotation omitted).   "[T]he specification is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."  *Id*. (internal quotation marks and citation omitted).  But, "[a]lthough

the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quotation marks and citation omitted). "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The prosecution history is another tool to supply the proper context for claim construction because, like the specification, the prosecution history provides evidence of how the U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent. *See Phillips*, 415 F.3d at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* at 1318. *See also Athletic Alternatives, Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (Ambiguous prosecution history may be "unhelpful as an interpretive resource.").

Although extrinsic evidence can also be useful, it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *C.R. Bard, Inc.*, 388 F.3d at 862. Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which a POSITA might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or

may not be indicative of how the term is used in the patent. *Phillips*, 415 F.3d at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are entirely unhelpful. *See id*. Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id*.

## B.      Departing from the Ordinary Meaning of a Claim Term

There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution." *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quotation marks and citation omitted). *See also GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."). The standards for finding lexicography or disavowal are "exacting." *GE Lighting Sols.*, 750 F.3d at 1309.

To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term" and "clearly express an intent to define the term." *Id.* (quotation marks and citation omitted). The patentee's lexicography must appear "with reasonable clarity, deliberateness, and precision." *Renishaw*, 158 F.3d at 1249.

To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable"

surrender.  *Cordis Corp. v. Boston Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009).  *See also Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012) ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope.").  "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable."  *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

Although a statement of lexicography or disavowal must be exacting and clear, it need not be "explicit."  *See Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1364 (Fed. Cir. 2016) ("[A] patent applicant need not expressly state 'my invention does not include X' to indicate his exclusion of X from the scope of his patent.").  Lexicography or disavowal can be implied where, *e.g.*, the patentee makes clear statements characterizing the scope and purpose of the invention.  *See On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1340 (Fed. Cir. 2006) ("[W]hen the scope of the invention is clearly stated in the specification, and is described as the advantage and distinction of the invention, it is not necessary to disavow explicitly a different scope.").  Nonetheless, the plain meaning governs "[a]bsent implied or explicit lexicography or disavowal."  *Trs. of Columbia Univ.*, 811 F.3d at 1364 n.2.

**C.      35 U.S.C. § 112, ¶ 6[2]**

A patent claim may be expressed using functional language.  *See* 35 U.S.C. § 112, ¶ 6; *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347 (Fed. Cir. 2015).  Section 112, ¶ 6 provides that a structure may be claimed as a "means . . . for performing a specified function" and that an act may be claimed as a "step for performing a specified function." *Masco Corp. v. United States*, 303 F.3d 1316, 1326 (Fed. Cir. 2002).  However, Section 112, ¶ 6 does not apply to all functional claim language.  There is a rebuttable presumption that Section 112, ¶ 6 applies when the claim language includes "means" or "step for" terms, and that it does not apply in the absence of those terms.  *See Masco Corp.*, 303 F.3d at 1326; *Williamson*, 792 F.3d at 1348.  The presumption stands or falls according to whether a POSITA would understand the claim with the functional language, in the context of the entire specification, to denote sufficiently definite structure for performing the function. *See Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1372 (Fed. Cir. 2015) (Section 112, ¶ 6 does not apply when "the claim language, read in light of the specification, recites sufficiently definite structure.") (quotation marks and citations omitted); *Williamson*, 792 F.3d at 1349 (Section 112, ¶ 6 does not apply when "the words of the claim are understood by persons of ordinary skill in the art to have sufficiently definite meaning as the name for structure."); *Personalized Media Commc'ns, L.L.C. v. Int'l Trade Comm'n*, 161 F.3d 696, 704 (Fed. Cir. 1998) (Section 112, ¶ 6 does not apply when the claim includes "sufficient structure, material, or acts within the claim itself to

---

[2] Under the America Invents Act, 35 U.S.C. § 112, ¶ 6 was recodified as 35 U.S.C. § 112(f).  I will refer to this provision as Section 112, ¶ 6.

perform entirely the recited function . . . even if the claim uses the term 'means.'") (quotation marks and citation omitted).

When it applies, Section 112, ¶ 6 limits the scope of the functional term "to only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof." *Williamson*, 792 F.3d at 1347. Construing a means-plus-function limitation involves multiple steps. "The first step . . . is a determination of the function of the means-plus-function limitation." *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). "[T]he next step is to determine the corresponding structure described in the specification and equivalents thereof." *Id.* A "structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Id.* The focus of the "corresponding structure" inquiry is not merely whether a structure is capable of performing the recited function, but rather whether the corresponding structure is "clearly linked or associated with the [recited] function." *Id.* The corresponding structure "must include all structure that actually performs the recited function." *Default Proof Credit Card Sys. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005). However, Section 112, ¶ 6 does not permit "incorporation of structure from the written description beyond that necessary to perform the claimed function." *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999).

### D.     Definiteness Under 35 U.S.C. § 112, ¶ 2[3]

Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention.  *See* 35 U.S.C. § 112, ¶ 2.  A claim, when viewed in light of the intrinsic evidence, must "inform those skilled in the art about the scope of the invention with reasonable certainty."  *Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014).  If it does not, the claim fails Section 112, ¶ 2 and is therefore invalid as indefinite. *See id.* at 901.  Whether a claim is indefinite is determined from the perspective of a POSITA at the time of filing the application.  *See id.* at 911.  As it is a challenge to the validity of a patent, the failure of any claim to comply with Section 112, ¶ 2 must be shown by clear and convincing evidence.  *See id.* at 912 n.10.  "[I]ndefiniteness is a question of law and in effect part of claim construction."  *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012).

When a term of degree is used in a claim, the court must determine whether the patent provides "some standard for measuring the term of degree."  *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1346 (Fed. Cir. 2018). "Claims having terms of degree do not fail for indefiniteness if they 'provide objective boundaries for those of skill in the art when read in light of the specification and the prosecution history.'"  *Versata Software, Inc. v. Zoho Corp.*, 213 F. Supp. 3d 829, 836

---

[3] Although 35 U.S.C. § 112, ¶ 2 was restyled as § 112(b) by the America Invents Act, the definiteness requirement remained the same.  I will refer to this provision as Section 112, ¶ 2.

(W.D. Tex. 2016) (quoting *Liberty Ammunition, Inc. v. United States,* 835 F.3d 1388, 1396 (Fed. Cir. 2016)).

## III.    AGREED TERMS

The parties originally disputed whether the terms "monitoring/monitor/monitored" required construction.  Defendants contended that the dispute revolved around whether "monitoring" also includes taking an action based on whatever is monitored.  During the Markman hearing, however, USWS confirmed that it agrees that "monitoring" does not include "controlling" or taking an action based on whatever is monitored.  Given USWS's concession, Defendants responded that there is no longer a claim construction dispute.  In view of the parties' agreement, I give the terms "monitoring/monitor/monitored" their plain and ordinary meaning.

## IV.    DISPUTED TERMS

The parties (i) dispute the construction of five terms; (ii)  dispute whether six terms are subject to Section 112, ¶ 6; and (iii) dispute whether certain terms are indefinite under Section 112, ¶ 2.  My analysis concerning each dispute is set forth below.  I consider my determinations on all three categories as part of the claim construction process.  The indefinite arguments under Section 112, ¶ 2 are also part of my summary judgment recommendation.

1.   **"electric motor diagnostics" ('410 Patent Claims 1 and 10; '601 Patent Claims 1 and 8; '728 Patent Claims 1 and 7)**

| Disputed Term | USWS's Proposal | Defendants' Proposal |
|---|---|---|
| "electric motor diagnostics" (Dkts. 72-2 at 11 (9:12; 9:47); 72-3 at 8 (7:31–32; 8:8–9); 72-4 at 12 (8:31–32; 8:66–67)) | Plain and ordinary meaning. | "the act of detecting a grounding or short in an electric motor" |

*a)*   ***The Parties' Positions***

The parties dispute whether the term, "electric motor diagnostics," should be limited to "the act of detecting a grounding or short in an electric motor," as Defendants propose, or if the term includes any diagnostics performed on an electric motor, as USWS proposes.

USWS argues that Defendants' construction does not reflect the purpose of "electric motor diagnostics" disclosed in the specification.  USWS contends that the VFD can be designed to improve the reliability of fracking operations.  According to USWS, the specification never suggests that VFDs can only detect "grounding or short."  USWS further argues that it would be "one of the cardinal sins of patent law" to import that limitation from a preferred embodiment to limit the scope of the claims.  Dkt. 72 at 12 (citing *Phillips*, 415 F.3d at 1320).

USWS argues that the statements made by the patentees in the prosecution history do not limit the claim scope because the patentee distinguished prior art based on the argument that the VFD performs "diagnostics," not that the VFD specifically detects "grounding or a short."  USWS also argues that there is no clear and unmistakable disavowal because the patentee never addresses the disputed term in isolation.  USWS

further contends that the extrinsic evidence supports a broad reading of the disputed term.

Defendants respond that the "specification common to the Asserted Patents discusses 'electric motor diagnostics' only twice." Dkt. 78 at 9 (quoting Dkt. 72-2 at 7–8 (2:19-21, 3:66-4:1)). Defendants argue that the specification does not indicate in either instance that the "electric motor diagnostics" performed by the VFD could encompass any and all tests intended to remedy any and all potential problems with the motor. Defendants further argue that the prosecution history of the Asserted Patents clearly and explicitly states that the sole intended purpose of performing "diagnostics" is to detect a grounding or short in the motor. Defendants contend that their construction does not import the limitation from a preferred embodiment, but instead construes the claim language in light of the specification. Accordingly, Defendants assert that the specification and prosecution history are clear in explaining that the sole purpose and function of "electric motor diagnostics" is to protect the motor from a grounding or short.

USWS replies that Defendants do not contest that the plain and ordinary meaning of "electric motor diagnostics" is not limited to merely "detecting a grounding or short." USWS argues that the two sentences cited by Defendants in the specification merely state that "motor diagnostics can be performed . . . to prevent damage to a grounded or shorted electric motor." Dkt. 86 at 7 (quoting Dkt. 72-3 at 5–6 (2:19–21; 3:66–4:1)) (emphases omitted). USWS contends that neither disclosure defines the term "electric motor diagnostics" as being limited to only "detecting a grounding or short," and that the specification states that the VFD "can provide complete monitoring and protection of drive internal operations." *Id*. (quoting Dkt. 72-3 at 6 (3:63–64)) (emphasis omitted).

USWS further contends that Defendants' argument that the patentee "expressly relied on prosecution arguments to obtain issuance of the Asserted Patents" is incorrect. *Id.* at 8 (quoting Dkt. 78 at 5–6) (brackets omitted).   USWS argues that the patentee distinguished prior art on the basis that the claimed VFD performed electric motor diagnostics.  USWS contends that the patentee never argued that the definition of the term "electric motor diagnostics" is narrower than its plain and ordinary meaning.  Finally, USWS argues that Defendants' construction ignores the doctrine of claim differentiation.

### b)   *Analysis*

I find that the term "electric motor diagnostics" is used consistently in the claims and is intended to have the same general meaning in each claim.  I further find that the term is not limited to "the act of detecting a grounding or short in an electric motor," as Defendants propose.

The specification of the '410 Patent states that the VFD, which performs the required diagnostics, "can provide complete monitoring and protection of drive internal operations."  Dkt. 72-3 at 6 (3:63–64).  One example provided of this monitoring is detecting a grounded or shorted electric motor.  Contrary to Defendants' contention, however, the specification does not indicate that the VFD is limited or required to only detect a "grounding or short."  Indeed, the specification explicitly discloses that the VFD also detects temperature conditions of the power semiconductor heat sinks.  Granted, the heat sinks are not the same component as the electric motor, but this nonetheless indicates that the VFD is not limited to one specific diagnostic.  Accordingly, I find that Defendants' construction would improperly limit the claims to a disclosed embodiment.  *See GE*

*Lighting Sols.*, 750 F.3d at 1309 ("[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." (quoting *Medrad*, 358 F.3d at 913)); *Bradium Techs. LLC v. Iancu*, 923 F.3d 1032, 1044 (Fed. Cir. 2019) ("It is not enough for a patentee to simply disclose a single embodiment or use a word in the same manner in all embodiments, the patentee must clearly express an intent to redefine the term." (internal quotation marks and citation omitted)).

Defendants argue that the prosecution history clearly and explicitly states that the sole intended purpose of performing "diagnostics" is to detect a ground or short in the motor. I disagree with Defendants' analysis of the prosecution history. First, a patent's prosecution history "represents an ongoing negotiation between the PTO and the applicant" and "often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1317. Moreover, for prosecution disclaimer to arise, "the alleged disavowing actions or statements made during prosecution [must] be both clear and unmistakable." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1326 (Fed. Cir. 2003). I find that the patentees' statements did not rise to the level of a clear and unmistakable disclaimer.

In the May 18, 2015 Response to Final Action, the patentees argued the following:

Applicants have amended claims 1, 8, and 18 to recite a variable frequency drive that performs electric motor diagnostics to prevent damage to the electric motor of [sic] it becomes grounded or shorted. . . . This feature is advantageous because the electric motors of the technology described in the patent application can operate in harsh environments, and drive large pumps

18

used to pump hydraulic fracturing fluid into a well at high pressures.

Dkt. 72-7 at 8–9. As indicated, the patentees amended the language of claims 1, 8, and 18 to recite that "the variable frequency drive frequently performs electric motor diagnostics to prevent damage to the at least one electric motor if [it/they] become[(s)] grounded or shorted." *Id.* at 4–6. However, the language Defendants seek to include in the construction does not appear in the allowed claims of the '410 Patent. Specifically, the phrase "if it becomes grounded or shorted" was deleted from the claims. In other words, it appears that the only requirement related to patentability was the recited "diagnostics." Thus, when the patentees' statements "are considered in the context of the prosecution history as a whole, they simply are not clear and unmistakable enough to invoke the doctrine of prosecution history disclaimer." *Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1343 (Fed. Cir. 2009).

Moreover, Defendants' construction ignores the doctrine of claim differentiation. *See Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1369 (Fed. Cir. 2012) (There is a "general presumption that different terms have different meanings."). For example, claim 1 of the '601 Patent states that diagnostics are performed "to prevent damage to the electric motors *if they become grounded or shorted*." Dkt. 72-2 at 11 (9:12–13) (emphasis added). As discussed above, claim 1 of the '410 Patent does not include "grounded or shorted" language, but instead only states that diagnostics are performed "to prevent damage to the at least one electric motor." Dkt. 72-3 at 8 (7:32–33). This indicates that when the patentees wanted to provide an added limitation concerning the electric motor diagnostics, they understood how to include that language in the claims.

Consequently, I find that the term "electric motor diagnostics" is not limited to

"detecting a grounding or short" and should be afforded its plain meaning.

> **2.    "a first transformer for stepping down a voltage of electricity from an electrical source to a voltage that is useable by the pump, and a second transformer that steps down a voltage of the electricity useable by the pump to a voltage that is useable by the heater" ('728 Patent Claim 12)**

| Disputed Term | USWS's Proposal | Defendants' Proposal |
|---|---|---|
| "a first transformer for stepping down a voltage of electricity from an electrical source to a voltage that is useable by the pump, and a second transformer that steps down a voltage of the electricity useable by the pump to a voltage that is useable by the heater" (Dkt. 72-4 at 13) | Plain and ordinary meaning. | "a single (first) transformer between an electrical source and the motor, and a single (second) transformer between the first transformer and an electrical heater, wherein the transformers, electrical heater, motor, and electrical source are on the same electric circuit, and the electrical source is a plant or unit that generates electricity" |

> ### a)    The Parties' Positions

The parties dispute whether the phrase, "a first transformer for stepping down a voltage of electricity from an electrical source to a voltage that is useable by the pump, and a second transformer that steps down a voltage of the electricity useable by the pump to a voltage that is useable by the heater," requires construction.

USWS argues that Defendants improperly limit the claim to a two-transformer configuration from the specification.  USWS explains that the claim language does not preclude the use of a third transformer.  USWS also contends that Defendants' construction includes terms and phrases that are found nowhere in the intrinsic record.  USWS asserts that the significant departure from the original claim language is highlighted by the need to replace the word "pump" with "motor" in Defendants' construction.  Finally, USWS

contends that the new requirement that the "the electrical source is a plant or unit that generates electricity" is meritless.  Dkt. 72 at 16.

Defendants argue that their construction captures two aspects of the claim term: (1) the devices are on the same electrical circuit; and (2) there is a physical and/or electrical relationship between the devices.   Based on an unspecified dictionary definition, Defendants explain that the words "voltage useable by the pump" and "voltage useable by the heater" mean that "electricity flows to the device to electrically operate or energize the device."  Dkt. 78 at 12 (citing Dkt. 78-3 at 2–8).  Defendants also argue that the "electrical devices in these embodiments are described as part of a 'micro-grid' and in electrical communication, so that electricity at specified voltages is communicated by electrical lines to electrically power end user devices."  *Id.* at 13 (quoting Dkt. 72-4 at 11 (5:6–12, 5:22–26)) (emphasis omitted).

Defendants contend that the use of the claim term in the description of electrical devices in Figures 1–4 of the '728 Patent literally describes an electrical circuit and comports with the proposed construction.  Defendants also argue that the '728 Patent uses the term "circuit" to explain that a coil in the heater "provides electrical connectivity through which an electrical circuit can be conducted."  *Id.* (quoting Dkt. 72-4 at 12 (7:63–8:4)).  Defendants further contend that the interrelation of voltages and devices requires the second transformer to be electrically connected to the voltage "useable by the pump" while also being electrically connected with the heater.  *Id.* at 14.

Defendants argue that their construction does not exclude the disclosed embodiment.  Defendants also state that they do not contend that the claim scope is limited

to only two transformers. Defendants concede that the claimed invention can include any number of transformers, voltages, and other components, so long as the arrangement of these elements does not violate the remaining limitations in the claim term.

USWS replies that Defendants completely rewrite the straightforward language of the disputed term based on the embodiments of the specification. USWS argues that Defendants remove the concepts of "stepping down a voltage of electricity" from the explicit claim language, despite disclosures that reveal step down transformers are part of the claimed invention. USWS further contends that Defendants' construction improperly seeks to limit the plain and ordinary claim language to an example embodiment from the specification.

### b) *Analysis*

I find that the disputed phrase is unambiguous, is easily understandable by a jury, and should be given its plain and ordinary meaning. *See Aventis Pharm., Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013) ("There is a heavy presumption that claim terms are to be given their ordinary and customary meaning.").

A plain reading of the claim language includes the concept that the transformers are included for the purpose of "stepping down a voltage of electricity." However, Defendants entirely remove this concept from the explicit claim language. Removing this concept from the claim renders Defendants' proposed construction obsolete because the plain language supports the inclusion of this concept and the concept is supported by the specification. *See* Dkt. 72-4 at 11 (5:9–12) (Mirroring the claim language, the '728 Patent specification states that the transformers "step[] down voltage of the electricity generated

22

by the generator to a voltage more compatible for use by electrical powered devices in the hydraulic fracturing system." (references omitted)); *id.* (5:19–21) (The "transformer steps the voltage down from 13.8 kV to around 600 V." (reference omitted)); *id.* (5:21–22) ("Other stepped down voltages can include 4,160 V, 480 V, or other voltages."). Consequently, Defendants' construction improperly alters the plain meaning of the "transformer" claim limitations.

Defendants have failed to provide a persuasive reason to redefine "voltage useable by the [heater or pump]" to "electricity flows to the device to electrically operate or energize the device" based on a generic dictionary definition. Defendants cite six pages of a dictionary with hundreds of definitions in support of this construction without specifying which definition or definitions are relevant. After reviewing these definitions, I find that none of them support Defendants' construction.

Defendants' construction improperly reads in an exemplary embodiment by injecting the limitation that the transformers, heater, motor, and electrical source are all "on the same electric circuit." This is not a requirement of the claims. Defendants' construction not only improperly narrows the claim language but also risks confusing the jury as to what the phrase "on the same electric circuit" means in the context of the claims. This is especially true given Defendants' construction replaces the term "pump" with the term "motor."

Similarly, Defendants' construction requires the word "between," which creates unnecessary ambiguity because it suggests a physical positioning of components that is not required by the original claim. Defendants also introduce the limitation "wherein the

transformers, electrical heater, motor, and electrical source are on the same electric circuit," even though the claim language itself already captures a progression of voltages in a circuit. Finally, the requirement that the "the electrical source is a plant or unit that generates electricity" is unnecessary and could be understood to contradict the specification. For example, the specification discloses batteries as a potential electrical source, which could reasonably be understood to store electricity rather than generate electricity. *See* Dkt. 72-4 at 12 (8:13–16).

In seeking to redraft the disputed term, Defendants argue that their construction "does not exclude the disclosed embodiment." Dkt. 78 at 14. However, the problem with Defendants' construction is not that they excluded a disclosed embodiment but that they are improperly seeking to limit the plain and ordinary meaning to an exemplary embodiment disclosed in the specification. Defendants go beyond the requirement that there be at least two transformers and propose a construction that creates more confusion than clarity. The Federal Circuit has cautioned against courts positing constructions that "contribute nothing but meaningless verbiage to the definition of the claimed invention." *Harris Corp. v. Ixys Corp.*, 114 F.3d 1149, 1152 (Fed. Cir. 1997). *See also U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy."); *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's

24

asserted claims."). Simply stated, "Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee." *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999). Defendants' proposal is nothing more than an attempt to rewrite the plain language of the claim to something that is no more clear than the original language. Consequently, I find that the disputed phrase should be given its plain and ordinary meaning.

### 3.    "attached" ('410 Patent Claim 10; '601 Patent Claim 8)

| Disputed Term | USWS's Proposal | Defendants' Proposal |
|---|---|---|
| "attached" (Dkts. 72-2 at 11 (9:43); 72-3 at 8 (8:4)) | Plain and ordinary meaning. | "fastened or joined" |

#### a)    *The Parties' Positions*

The parties dispute whether the term "attached" requires construction.

Defendants argue that "attached" is a common word that is easily understood. According to Defendants, however, the widely understood meaning of "attached" is "fastened or joined."

USWS replies that Defendants ignore all of the deficiencies of their proposed construction and merely opine that "attached" really means "fastened or joined." USWS argues that neither the term "fastened" nor "joined" appears in the specification and the jury will have no guidance on the meaning of these terms. USWS contends that Defendants have no basis to substitute "attached" with different terms that are found nowhere in the Asserted Patents and are presumed to have a different meaning.

### b)   *Analysis*

I find that the term "attached" is used consistently in the claims and is intended to have the same general meaning in each claim.  I further find that the disputed term is unambiguous, is easily understandable by a jury, and should be given its plain and ordinary meaning.  Indeed, I agree with Defendants' concession that "'[a]ttached' is a common word that is easily understood."  Dkt. 78 at 15.

Independent claim 10 of the '410 Patent and independent claim 8 of the '601 Patent require "an electric motor having a high-strength steel or steel alloy drive shaft *attached to* the pump and configured to drive the pump."  Dkts. 72-2 at 11 (9:42–44); 72-3 at 8 (8:3–5) (emphasis added).  As recited in the claims, a jury will not have a problem understanding that the electric motor has a drive shaft that is "attached to" the pump.

Despite their concession that the term is easily understood, Defendants argue that "the widely understood meaning of 'attached' is 'fastened or joined.'"  Dkt. 78 at 15. However, Defendants have not provided a persuasive reason for redrafting the claims as they propose.   The patentees used the term "attached," and given that it is "easily understood," replacing "attached" with terms that the patentees did not use would risk changing the scope of the claims.  *See Salomon S.A.*, 191 F.3d at 1364 ("Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee.").  Furthermore, neither the term "fastened" nor "joined" appears in the specification, and the jury will have no guidance on the meaning of those terms.  Because the plain meaning of "attached" is easily understood, adopting Defendants' proposed construction would only risk unnecessarily obfuscating the plain meaning.  *See Biotec Biologische Naturverpackungen*

*GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d 1341, 1349 (Fed. Cir. 2001) ("[T]he meaning of 'melting' does not appear to have required 'construction,' or to depart from its ordinary meaning."). Moreover, I have no assurance that the jury's subjective understanding of "fastened" or "joined" will not differ from the easily understood meaning of "attached."

Accordingly, I reject Defendants' construction and give the term "attached" its plain and ordinary meaning.

### 4. "coupled to" ('728 Patent Claim 7)

| Disputed Term | USWS's Proposal | Defendants' Proposal |
|---|---|---|
| "coupled to" (Dkt. 72-4 at 12 (8:64)) | Plain and ordinary meaning. | "longitudinal connection for rotation" |

#### a) *The Parties' Positions*

The parties dispute whether the term "coupled to" requires construction.

Defendants argue that their construction, "longitudinal connection for rotation," is derived from the intrinsic and extrinsic evidence. Defendants point to a dictionary definition that defines "couple" as "a pair of forces, equal and parallel, but acting in opposite directions, which tend to rotate the body on which they act." Dkt. 78 at 17 (quoting Dkt. 78-9 at 5). Defendants explain that a "longitudinal connection for rotation" is consistent with this definition of "couple," and that this definition of "couple" is consistent with the specification. Defendants also argue that USWS's expert, Dr. Robert Schaaf ("Dr. Schaaf"), is correct that "coupled to" cannot just refer to any generic "connection" between the electric motor and pump but refers to a specific type of connection that allows the electric motor to drive the pump. Defendants contend that the

'728 Patent specification only uses "coupled to" to describe the relationship of the electric motor to the pump.  According to Defendants, the "coupled to" language recited in claim 7 of the '728 Patent must hold a different meaning than merely "connected."

USWS replies that Defendants' construction has no support in the intrinsic or extrinsic record.  USWS explains that the words "longitudinal connection for rotation" never appear in the claims, the specifications, or the prosecution history.  USWS contends that the dictionary definition defining the standalone term "couple" as "a pair of forces, equal and parallel, but acting in opposite directions, which tend to rotate the body on which they act," has no connection with the patent.  Dkt. 86 at 11.  USWS also argues that Defendants omit their own disclosures of other dictionaries that provide other definitions for the word "couple" that are not so narrowly defined or limited to the context of rotation.

USWS further argues that Defendants mischaracterize Dr. Schaaf's testimony, which it contends makes it clear that "coupled to" is in fact a generic connection that does not need a specific definition.  USWS also contends that Defendants are not comparing the disputed term "coupled to" to another claim term that was used by the patentees in a similar context, and, thus, the doctrine of claim differentiation does not apply.  USWS concludes that the term "coupled to" is easily understood and requires no construction.

### b)    *Analysis*

A jury will not have a problem understanding that "coupled to" describes a connection between the electric motor and pump, which allows the electric motor to drive the pump.  Consequently, I find that the disputed term is unambiguous, is easily understandable by a jury, and should be given its plain and ordinary meaning.

The intrinsic evidence does not support Defendants' construction. The words "longitudinal connection for rotation" do not appear anywhere in the intrinsic evidence. In describing the figure below, the '728 Patent specification states that "motor 39 connects to pump system 36 via connection 40." Dkt. 72-4 at 10 (4:44-45).



*Id.* at 4. By using the term "connects" synonymously with "coupled to" to describe the same "connection" between the motor and pump, the specification indicates that the patentee did not intend to limit "coupled to" to the narrow construction proposed by Defendants. Thus, the intrinsic evidence indicates that "coupled to" is not narrowly limited to a "longitudinal connection for rotation."

Defendants contend that "[s]everal dictionary definitions define 'couple' as 'a pair of forces, equal and parallel, but acting in opposite directions, which tend to rotate the body on which they act." Dkt. 78 at 17 (quoting Dkt. 78-9 at 5). Defendants offer this definition as the basis of their construction and argue that it is consistent with the specification. *Id.* I disagree and find that this definition is completely irrelevant because it is the definition of the noun, "couple," not the adjective, "coupled," or the root verb from which the

adjective is derived, "couple."   The definition of the noun, "couple," has absolutely no relation to the meaning of the adjective, "coupled," as it is being used in this context.   Thus, the dictionary definition Defendants offer as the basis of their construction is entirely irrelevant.

During the Markman hearing, Defendants confirmed that they interpret their construction as requiring the pump and motor to be on the same centerline or same axis of rotation.   Dr. Schaaf opines that "coupled to" is not limited to a connection on the same axis.   Indeed, "the connection between an electric motor and a pump is often accomplished by using a gearbox, belt, or chain, in which the motor rotates a component that is not on the same axis as the component used to drive the pump."   Dkt. 78-10 at 18, ¶ 50. Defendants' expert, Dr. Gary Wooley ("Dr. Wooley"), did not opine as to the meaning of "coupled to."   Consequently, I find that Defendants' construction is inconsistent with the extrinsic evidence.

The final reason why Defendants' construction is not appropriate is the testimony of Dr. Schaaf, who opined, "the term 'coupled to' is well-understood in the art to be a ***general*** term that describes connections between two components."   Dkt. 73-3 at 15, ¶ 47. Although expert testimony usually does not carry great weight in construing claims, Dr. Schaaf's testimony lends credence to the plain meaning because there is no inconsistent intrinsic or extrinsic evidence.

Defendants have not provided a persuasive reason to adopt a narrow construction of "coupled to."   Accordingly, I reject Defendants' construction and give the term "coupled to" its plain and ordinary meaning.

5.      **"electrically connected to the plurality of electric pumps to provide electrical power to the pumps" ('278 Patent Claim 1; '410 Patent Claim 4; and '601 Patent Claim 1)**

| Disputed Term | USWS's Proposal | Defendants' Proposal |
|---|---|---|
| "electrically connected to the plurality of electric pumps to provide electrical power to the pumps" (Dkts. 72-2 at 11 (9:14–15); 72-3 at 8 (7:41–43); 72-5 at 18 (21:46–48)) | Plain and ordinary meaning. | "on the same electrical circuit as the electric pumps, such that electricity flows from the generators to the pumps" |

a)    *The Parties' Positions*

The parties dispute whether the phrase, "electrically connected to the plurality of electric pumps to provide electrical power to the pumps," requires construction. Defendants argue that "electricity flows from the generators to the pumps," and, thus, there cannot be an intervening electric motor between the generators and the pumps.

USWS contends that Defendants' construction could require bypassing the electric motor, which would conflict with both the claim language and the embodiment of the invention discussed in the specification. USWS argues that a POSITA would recognize that the pumps require electric motors to use electrical power because the electric motor converts electrical power into the mechanical power that operates the pumps. USWS further argues that all relevant disclosures in the intrinsic record show that the pumps are driven by an electric motor, and that ruling out the use of an intervening electric motor would improperly read out a preferred embodiment.

USWS also argues that the phrase "electrical circuit" appears nowhere in the patent

specification.  USWS contends that the specification will provide the jury no assistance in determining whether something is on "the same electrical circuit."  USWS argues that there is no justification for departing from the actual commonly understood language used in the claims.

Defendants assert that the express language of the claims requires generators "electrically connected to the electric pumps to provide electrical power to the pumps." Dkt. 78 at 21 (brackets omitted).  Defendants contend that there is no mention of electrical connection to electric motors.  Defendants further argue that other patent claims recite the generator as being electrically connected and providing electrical power to the motor. According to Defendants, this reflects the patentees' intention to draft claims of different scope, particularly in respect to generator-motor-pump arrangements.

Defendants further argue that the embodiment USWS contends is excluded by Defendants' construction is covered by other claims.  Defendants assert that this does not justify reading limitations into the claim so that it now reads on USWS's embodiment of choice.

### b)   *Analysis*

I find that the phrase, "electrically connected to the plurality of electric pumps to provide electrical power to the pumps," is used consistently in the claims and should be afforded its plain and ordinary meaning.

Defendants' construction risks misconstruing the claim language and confusing the jury.  As discussed in the specification, the generators produce electrical power and provide that electrical power to the pump's electric motor.  *See* Dkt. 72-3 at 6 (4:26–29) ("[A]

32

plurality of electric generators that are connected to, and provide power to, the electric motors on the pump vehicles.") (references omitted).   The electric motors then use the electrical power to drive the pumps.   *See id.* at 6 (3:23) ("[T]he pumps are powered by electric motors.") (references omitted); *id.* at 7 (5:59–61) ("[A] plurality of turbine generators that are connected to, and provide power to, the electric motors.") (references omitted); *id.* at 8 (7:22–25) ("[T]he system comprising: a plurality of electric pumps fluidly connected to the well and powered by at least one electric motor.").   Specifically, the motors convert the electrical power to mechanical power, which is used to drive the pumps. *See* Dkt. 78-10 at 19–20, ¶ 55.   Defendants' construction risks confusing the jury because the language implies that the pumps could still operate even without an intervening electric motor.

Defendants argue that "there is no mention of electrical connection to electric motors."   Dkt. 78 at 21.   Defendants contend that the claims and specification describe "that power is communicated or distributed *directly from the generator to the pump* by way of a physical line or path*." Id.* at 22 (emphasis added).   Defendants further contend that this is consistent with the definition of an "electrical circuit." *Id.*   I disagree.   Defendants' construction of bypassing an electric motor contradicts the claim language and the embodiments disclosed in the specification.   Indeed, a POSITA would recognize that the pumps are powered through the pumps' electric motors, which convert that electrical power into the mechanical power used by the pumps. *See* Dkt. 78-10 at 19–20, ¶ 55.   Thus, Defendants' construction would improperly exclude from the scope of the claims a preferred embodiment. *GE Lighting Sols.*, 750 F.3d at 1311 ("[W]here claims can

reasonably [be] interpreted to include a specific embodiment, it is incorrect to construe the claims to exclude that embodiment, absent probative evidence on the contrary." (quotation marks and citation omitted)).

Consequently, I give the phrase, "electrically connected to the plurality of electric pumps to provide electrical power to the pumps," its plain and ordinary meaning.

### 6. "A/C console and a variable frequency drive that controls the speed of the pump" ('410 Patent Claim 2)

| Disputed Term | USWS's Proposal | Defendants' Proposal |
|---|---|---|
| "A/C console and a variable frequency drive that controls the speed of the pump" (Dkt. 72-3 at 8 (7:35–36)) | This term is not subject to 35 U.S.C. § 112, ¶ 6.<br><br>In the alternative, if the term is subject to Section 112, ¶ 6, the limitation provides a sufficiently definite structure.<br><br>**Function:** controls the speed of the pump.<br><br>**Structure:** A/C console and/or VFD; and equivalents thereof. | This limitation is a means plus function limitation governed by pre-AIA 35 U.S.C. § 112, ¶ 6.<br><br>**Function:** controls the speed of the pump.<br><br>**Structure:** This specification fails to disclose sufficient structure for performing the recited functions of the "means-plus-function" element, rendering this term indefinite. |

### a) The Parties' Positions

The parties dispute whether the phrase, "A/C console and a variable frequency drive that controls the speed of the pump," is subject to Section 112, ¶ 6.

USWS argues that the phrase does not use the word "means," and, thus, a rebuttable presumption exists that Section 112, ¶ 6 does not apply. USWS contends that Defendants do not have sufficient evidence to overcome the presumption by showing that the claim language does not recite sufficiently definite structure. Based on Dr. Schaaf's opinion, USWS asserts that the claim language sufficiently identifies structure to a POSITA.

USWS points out that Defendants' expert did not opine on the issue at all.  USWS further argues that no intrinsic evidence suggests that a POSITA would find the claim language fails to sufficiently disclose a definite structure.

Defendants respond that the term "console" is a nonce word because it does not provide any indication of structure.  Defendants contend that adding the term "A/C" to "console" does not impart any further indication of structure because there is nothing in the claims, specification, or file history that imparts any structure with this term. Defendants argue that Dr. Schaaf's opinion does not provide a citation or relevant evidence that a POSITA would readily recognize a structure associated with "A/C console."

USWS replies that Defendants have failed to identify a single case that indicates "A/C console" is a nonce word.  USWS further responds that Dr. Schaaf cited both the specifications and industry publication in support of his opinion.  USWS concludes that Defendants have not set forth sufficient evidence to rebut the presumption that Section 112, ¶ 6 does not apply.

### b)   *Analysis*

I find that the phrase, "A/C console and a variable frequency drive that controls the speed of the pump," is not subject to Section 112, ¶ 6.

It is well-settled that "a claim term that does not use 'means' will trigger the rebuttable presumption that § 112, [¶] 6 does not apply."  *Apex Inc. v. Raritan Comput., Inc.*, 325 F.3d 1364, 1371 (Fed. Cir. 2003) (quotation marks and citation omitted).  The presumption against the application of Section 112, ¶ 6 may be overcome if a party can "demonstrate[] that the claim term fails to recite sufficiently definite structure or else

recites function without reciting sufficient structure for performing that function." *Williamson*, 792 F.3d 1349 (internal quotation marks, brackets, and citation omitted).  "In undertaking this analysis, [I must] ask if the claim language, read in light of the specification, recites sufficiently definite structure to avoid [Section 112, ¶ 6]." *Robert Bosch, LLC v. Snap-On Inc.*, 769 F.3d 1094, 1099 (Fed. Cir. 2014).

Here, there is a rebuttable presumption that Section 112, ¶ 6 does not apply because the claim does not recite the word "means."  Thus, Defendants have the burden of rebutting the presumption.  Defendants fail to set forth any evidence to overcome the presumption. Indeed, the intrinsic evidence demonstrates that a POSITA would recognize the structure of an "A/C console and a variable frequency drive."  Claims 1 and 2 of the '410 Patent indicate that the "A/C console and . . . variable frequency drive" are physically separate from the recited "electric pumps" and "electric motor."  Dkt. 72-3 at 8 (7:19–36).  Claim 1 further recites that the VFD is connected to the electric motor to control the speed of the motor.  The specification teaches that the "variable frequency drives" include "power semiconductor heat sinks," and that those "heat sinks" have "thermal sensors monitored by a microprocessor."  *Id.* at 5 (2:19–25), 6 (3:56–62).  These components—VFD, power semiconductor, heat sinks, thermal sensors, and microprocessor—are well-understood structures to a POSITA.  *See* Dkt. 78-10 at 22–24, ¶ 63.  In one embodiment, the specification discusses the "hardware" of the VFD, and states that "each electric motor can be equipped with a variable frequency drive (VFD), and an A/C console, that controls the speed of the electric motor, and hence the speed of the pump."  Dkt. 72-3 at 6 (3:39–42, 3:54–62) (references omitted).  Thus, the intrinsic evidence describes functions of and the

structural interactions between the A/C console, VFD, and other recited elements, which indicates that the claim is not subject to Section 112, ¶ 6. *See Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1319–21 (Fed. Cir. 2004) (finding that "circuit [for performing a function]" was sufficiently definite structure because the claim recited the "objectives and operations" of the circuit); *Smartflash LLC v. Apple Inc.*, No. 6:13-CV-447-JRG-KNM, 2015 WL 4208754, at *3 (E.D. Tex. July 7, 2015) (When a claim includes "substantial additional language describing the operation of the components at issue and their interaction with other components," the claim is generally not subject to Section 112, ¶ 6.).

Likewise, the extrinsic evidence is consistent with the intrinsic evidence. The extrinsic evidence includes an illustration of a VFD with a control panel. *See* Dkt. 72-9 at 80. Defendants' own advertisements for lease of the accused products on its website specifically use the same term "VFD" to describe the corresponding structure in the accused product. Defendants cannot persuasively argue that the "variable frequency drive" language fails to identify structure to a POSITA when Defendants use the same language in their own documents to refer to a structure. In addition, Dr. Schaaf opines that "A/C console and a variable frequency drive" sufficiently identifies structure to a POSITA. *See* Dkt. 72-9 at 20–21, ¶¶ 58–59 (A "variable frequency drive" is a "structure that is widely used in the industry" and is "an electromechanical system that controls the speed of an electric alternating current ("A/C") motor. . . . 'A/C console' refers to a structure that can modify the A/C waveform (i.e., the voltage and frequency) of the alternating current supplied to the electric motor." (citation omitted)). Defendants' expert, Dr. Wooley, does

37

not opine on the issue. All of this extrinsic evidence shows that the disputed phrase does have a corresponding structure. Accordingly, the phrase, "A/C console and a variable frequency drive," conveys structure to a POSITA.

Defendants argue that the term "A/C console" is a nonce word that can operate as a substitute for "means" because the word "console" does not provide any indication of structure. I disagree. *Williamson*, the case cited by Defendants, only generically discusses nonce words in claim construction, offering no guidance on the term "A/C console." *See* 792 F.3d at 1350. ("Generic terms such as 'mechanism,' 'element,' 'device,' and other nonce words that reflect nothing more than verbal constructs may be used in a claim in a manner that is tantamount to using the word 'means' because they typically do not connote sufficiently definite structure.") (internal quotation marks and citation omitted). It may be true that the word "console" could be a nonce term in isolation. However, the disputed term does not recite the word "console" in isolation, and Defendants have not cited any authority that determined "A/C console" to be a nonce word or a verbal construct. Moreover, Dr. Schaaf's opinion further confirms that "A/C console" is not a nonce term when considered in its proper context by stating, "A/C console . . . clearly refers to specific equipment when used in conjunction with 'variable frequency drive.'" Dkt. 72-9 at 21, ¶ 59.

In summary, the intrinsic and extrinsic evidence shows that Defendants have failed to overcome the presumption that "A/C console and a variable frequency drive that controls the speed of the pump" is not a means-plus-function limitation. Consequently, I find that the disputed phrase is not subject to 35 U.S.C. § 112, ¶ 6.

**7.** **"wherein the variable frequency drive has/includes … power semiconductor heat sinks having … thermal sensors monitored by a microprocessor to prevent [semiconductor] damage caused by excessive heat" ('410 Patent Claim 9; '308 Patent Claim 6; and '601 Patent Claim 16)**

| Disputed Term | USWS's Proposal | Defendants' Proposal |
|---|---|---|
| "wherein the variable frequency drive has/includes . . . power semiconductor heat sinks having . . . thermal sensors monitored by a microprocessor to prevent [semiconductor] damage caused by excessive heat" (Dkts. 72-2 at 11 (10:12–15); 72-3 at 8 (7:53–56); 72-6 at 11 (8:21–24)) | This term is not subject to 35 U.S.C. § 112, ¶ 6.<br><br>In the alternative, if the term is subject to Section 112, ¶ 6, the limitation provides a sufficiently definite structure.<br><br>**Function:** to prevent damage caused by excessive heat.<br><br>**Structure:** power semiconductor heat sinks having thermal sensors monitored by a microprocessor; and equivalents thereof. | This limitation is a means plus function limitation governed by pre-AIA 35 U.S.C. § 112, ¶ 6.<br><br>**Function**: to prevent damage caused by excessive heat.<br><br>**Structure:** This specification fails to disclose sufficient structure for performing the recited functions of the "means-plus-function" element, rendering this term indefinite. |

### a)   The Parties' Positions

The parties dispute whether the phrase, "wherein the variable frequency drive has/includes . . . power semiconductor heat sinks having . . . thermal sensors monitored by a microprocessor to prevent damage caused by excessive heat," is subject to Section 112, ¶ 6.

USWS argues that the phrase does not use the word "means," and, thus, a rebuttable presumption exists that Section 112, ¶ 6 does not apply. USWS contends that Defendants do not have sufficient evidence to overcome the presumption by showing that the claim language does not recite sufficiently definite structure. Based on Dr. Schaaf's opinion,

USWS asserts that the claim language sufficiently identifies structure to a POSITA. USWS points out that Defendants' expert did not opine on the issue at all. USWS further argues that no intrinsic evidence suggests that a POSITA would find the claim language fails to sufficiently disclose a definite structure.

Defendants respond that the term "microprocessor" would not be understood by those skilled in the art as a sufficiently definite structure. Defendants argue that courts have consistently required that the structure be more than a general-purpose computer or microprocessor, and that the specification must disclose an algorithm for performing the claimed function. Defendants also contend the specification provides no support for USWS's assertion that the corresponding structure is the "power semiconductor heat sinks having thermal sensors monitored by a microprocessor." Dkt. 78 at 28. Disclosing generic hardware without providing some detail about the means to accomplish the function, Defendants argue, is not enough.

USWS replies that Dr. Schaaf's opinion—that a POSITA "would recognize that the structural arrangement described in the claim [] denotes structure"—is undisputed by Defendants' expert and not otherwise addressed in Defendants' brief. Dkt. 86 at 15. USWS further argues that this claim is not a "computer-implemented invention in which the inventor has invoked means-plus-function claiming." *Id.* at 16 (quoting *Aristocrat Techs. Austl. Pty. Ltd. v. Int'l Games Tech.*, 521 F.3d 1328 (Fed. Cir. 2008)). Instead, "'power semiconductor heat sinks,' which comprise 'thermal sensors monitored by a microprocessor,' . . . perform the claimed function of preventing damage caused by excessive heat." *Id.* (quoting Dkt. 72-3 at 5 (2:35–39), 6 (4:31–39), 8 (8:23–24)). Indeed,

both the claim language and specification describe the claimed "microprocessors" as components included in the VFD to monitor the heat sensed by "thermal sensors" on the "power semiconductor heat sinks." *Id.* (citing Dkt. 72-3 at 6 (4:31–39), 8 (8:23–24)). USWS explains that these disclosures of structure cannot reasonably be categorized as "no more than simply a general purpose computer or microprocessor." *Id.* (quoting *Aristocrat Techs.*, 521 F.3d at 1333) (brackets omitted).

> ### b) *Analysis*

The phrase, "wherein the variable frequency drive has/includes . . . power semiconductor heat sinks having . . . thermal sensors monitored by a microprocessor to prevent [semiconductor] damage caused by excessive heat," is used consistently in the claims and is intended to have the same general meaning in each claim. I find that the phrase is not subject to Section 112, ¶ 6.

As explained above, a claim term that does not use "means" triggers the rebuttable presumption that Section 112, ¶ 6 does not apply. *See Apex*, 325 F.3d at 1371. Defendants may overcome this presumption by showing that a POSITA would not be able to identify sufficiently definite structure in the claim language read in light of the specification. *See Robert Bosch*, 769 F.3d at 1099.

Here, there is a rebuttable presumption that Section 112, ¶ 6 does not apply because the claims do not recite the word "means." Defendants argue that the term "microprocessor" would not be understood by those skilled in the art as a sufficiently definite structure. Dkt. 78 at 27. According to Defendants, courts have consistently required that the structure be more than a general-purpose computer or microprocessor,

and that the specification must disclose an algorithm for performing the claimed function.

Contrary to Defendants' contention, this claim is not a "computer-implemented invention in which the inventor has invoked means-plus-function claiming." *Aristocrat Techs.*, 521 F.3d at 1333.   Defendants improperly attempt to import an "algorithm" requirement without first determining whether the phrase is in means-plus-function form pursuant to Section 112, ¶ 6.   The terms "power semiconductor heat sinks," "thermal sensors," and "microprocessor," like "detector" in *Personalized Media Communications*, 161 F.3d at 704–07, and "circuit" in *Linear Technology Corp.*, 379 F.3d at 1319–21, connotes sufficiently definite structure to avoid invoking Section 112, ¶ 6.   Specifically, the claims and the specification of the '410 Patent make clear that it is "power semiconductor heat sinks," which comprise "thermal sensors monitored by a microprocessor," that perform the claimed capability of preventing damage caused by excessive heat.   *See* Dkt. 72-3 at 6 (3:56–62) ("For example, as far as hardware is concerned, the VFD can include . . . power semiconductor heat sinks having one or more thermal sensors monitored by a microprocessor to prevent semiconductor damage caused by excessive heat.").   Thus, a POSITA would understand that the "power semiconductor heat sinks," "thermal sensors," and "microprocessor" limitations recite sufficient structure, and are not used as generic terms, black box recitations of structure, or abstractions.   *See Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1008 (Fed. Cir. 2018) ("[A] person of ordinary skill in the art could reasonably discern *from the claim language* that the words '*program*,' . . . and '*user interface code*,' . . . are used not as generic terms or black box recitations of structure or abstractions, but rather as specific references to conventional

graphical user interface programs or code, existing in prior art at the time of the inventions." (emphasis added)).

It is true that "when dealing with a special purpose computer-implemented means-plus-function limitation" and the corresponding means is software, the "specification [must] disclose [an] algorithm for performing the function" or else the means-plus-function limitation will be considered indefinite. *Function Media, LLC v. Google, Inc.*, 708 F.3d 1310, 1318 (Fed. Cir. 2013) (internal quotation marks and citation omitted). But that authority is not on point because that analysis is triggered only where the limitation is a means-plus-function limitation and the corresponding means is software. *See id.* Here, both the claim language and specification describe the claimed "power semiconductor heat sinks," "thermal sensors," and "microprocessor," as structural components included in the claimed "variable frequency drive" to monitor the temperature. Thus, the corresponding means is a structure rather than software and the limitation at issue is not a means-plus-function limitation. Consequently, the requirement that an algorithm must be disclosed was never triggered.

In summary, Defendants have not overcome the presumption against finding the disputed phrase is a means-plus-function limitation. Accordingly, I reject Defendants' argument that the phrase is subject to Section 112, ¶ 6.

8.    The "Centralized Control Unit" Phrases

| Disputed Term | USWS's Proposal | Defendants' Proposal |
|---|---|---|
| "the centralized control unit is configured to: monitor at least one of pressure and temperature of the plurality of electric pumps and the plurality of generators" ('278 Patent Claim 1) (Dkt. 72-5 at 18 (21:51–54)) | This term is not subject to 35 U.S.C. § 112, ¶ 6.<br><br>In the alternative, if the term is subject to Section 112, ¶ 6, the limitation provides a sufficiently definite structure.<br><br>**Function:** to prevent damage caused by excessive heat.<br><br>**Structure:** power semiconductor heat sinks having thermal sensors monitored by a microprocessor; and equivalents thereof. | This limitation is a means plus function limitation governed by pre-AIA 35 U.S.C. § 112, ¶ 6.<br><br>**Function:** to prevent damage caused by excessive heat.<br><br>**Structure:** This specification fails to disclose sufficient structure for performing the recited functions of the "means-plus-function" element, rendering this term indefinite. |
| "[Wherein the centralized control unit is] further [configured/comprising] [to reset/resetting] a fault occurring in the variable frequency drive" ('278 Patent Claims 6 and 15) (Dkt. 72-5 at 18 (22:1–3; 22:45–46)) | This term is not subject to 35 U.S.C. § 112, ¶ 6.<br><br>In the alternative, if the term is subject to Section 112, ¶ 6, the limitation provides a sufficiently definite structure.<br><br>**Function:** reset a fault occurring in the VFD.<br><br>**Structure:** data van and equivalents thereof. | This limitation is a means plus function limitation governed by pre-AIA 35 U.S.C. § 112, ¶ 6.<br><br>**Function:** reset a fault occurring in the VFD.<br><br>**Structure:** This specification fails to disclose sufficient structure for performing the recited functions of the "means-plus-function" element, rendering this term indefinite. |

| | | |
|---|---|---|
| "Wherein the centralized control unit is configured to: monitor one or more operating characteristics of the electric powered fracturing fleet" ('278 Patent Claim 19) (Dkt. 72-5 at 19 (23:7–10)) | This term is not subject to 35 U.S.C. § 112, ¶ 6.<br><br>In the alternative, if the term is subject to Section 112, ¶ 6, the limitation provides a sufficiently definite structure.<br><br>**Function:** monitor at least one of pressure and temperature of the plurality of electric pumps and the plurality of generators.<br><br>**Structure:** data van and equivalents thereof. | This limitation is a means plus function limitation governed by pre-AIA 35 U.S.C. § 112, ¶ 6.<br><br>**Function:** monitor one or more operating characteristics of the electric powered fracturing fleet.<br><br>**Structure:** This specification fails to disclose sufficient structure for performing the recited functions of the "means-plus- function" element, rendering this term indefinite. |
| "Wherein the centralized control unit is configured to: … control one or more operating characteristics of the electric powered fracturing fleet" ('278 Patent Claim 19) (Dkt. 72-5 at 19 (23:7–12)) | This term is not subject to 35 U.S.C. § 112, ¶ 6.<br><br>In the alternative, if the term is subject to Section 112, ¶ 6, the limitation provides a sufficiently definite structure.<br><br>**Function:** control one or more operating characteristics of the electric powered fracturing fleet.<br><br>**Structure:** data van and equivalents thereof. | This limitation is a means plus function limitation governed by pre-AIA 35 U.S.C. § 112, ¶ 6.<br><br>**Function:** control one or more operating characteristics of the electric powered fracturing fleet.<br><br>**Structure:** This specification fails to disclose sufficient structure for performing the recited functions of the "means-plus- function" element, rendering this term indefinite. |

### a) *The Parties' Positions*

The parties dispute whether the "centralized control unit" phrases are subject to

Section 112, ¶ 6.

USWS argues that the phrase does not use the word "means," and, thus, a rebuttable

45

presumption exists that Section 112, ¶ 6 does not apply.  USWS contends that Defendants do not have sufficient evidence to overcome the presumption by showing that the claim language does not recite sufficiently definite structure.  Based on Dr. Schaaf's opinion, USWS asserts that the claim language sufficiently identifies structure to a POSITA. USWS points out that Defendants' expert did not opine on the issue at all.  USWS further argues that no intrinsic evidence suggests that a POSITA would find the claim language fails to sufficiently disclose a definite structure.

USWS asserts that the specification of the '278 Patent discloses a "data van" as the structure that performs the claimed functions.  USWS further argues, based on Dr. Schaaf's opinion, that a POSITA "would understand that the '278 Patent [discloses] a 'data van' as the structure that performs the claimed functionality of various said 'centralized control unit' limitations."  Dkt. 72 at 27–28 (quoting Dkt. 78-10 at 29, ¶ 74).

Defendants respond that the "centralized control unit" phrases are means-plus-function limitations because "unit" is a nonce word and reflects nothing about the structure of the device itself.  Defendants further argue that "centralized control" does not add any structural specificity to "unit."  Defendants contend that the prefix "centralized control" describes the term "unit" solely in terms of its location ("centralized") and function ("control").  Defendants also argue that the remainder of the claim terms fails to provide any structure to the term "unit" because the functional language fails to describe how the "unit" interacts with other components in such way that it might inform the structural character of the "unit" or otherwise impart structure to the "unit."

Defendants argue that there is no support for USWS's argument that the "centralized

control unit" is the "data van."  Defendants further argue that the data van is merely where the functions are performed, not the structure that performs those functions.  Defendants contend that if a computer in the "data van" provides the structure, then the specification must disclose an algorithm for performing the claimed functions.  Defendants argue that the closest description of the necessary algorithm or programmable instructions is one mention of software.  Defendants contend that no corresponding structure is disclosed for the claimed functions and the respective claims are indefinite.

USWS replies that the cases cited by the parties show that the use of the word "unit" is not dispositive.  USWS argues that Defendants must still show by a preponderance of the evidence that the term "centralized control unit," as used in these claims, is not "understood by a [POSITA] to have a sufficient definite meaning as the name for structure."  Dkt. 86 at 17 (quoting *Fisher-Rosemount Sys., Inc. v. ABB Ltd*, No. 4:18-CV-00178, 2019 WL 6830806, at *3 (S.D. Tex. Dec. 12, 2019)).  Based on Dr. Schaaf's opinion, USWS asserts that this term has "structural meaning in the context of hydraulic fracturing operations."  *Id.* (quoting Dkt. 72-9 at 25, ¶ 66).  USWS further argues that the claims at issue describe interactions between the "centralized control unit" and other components, which is a strong indicator of the structural character of the disputed term.

USWS contends, based on Dr. Schaaf's opinion, that the specification sufficiently identifies to a POSITA the "data van" as the structure that performs the claimed "centralized control unit" functions.  USWS further argues that the '278 Patent specification specifically describes "monitor/control data van 40" as a structure "mounted on a control vehicle 42" and "connected to pumps 10, electric motors 14, blenders 34, and

other tools." *Id.* at 19 (quoting Dkt. 72-5 at 10 (5:7–11)) (brackets omitted).  Finally, USWS argues that Defendants' own documents repeatedly refer to the corresponding structural component in their electric fracturing system as a "data van."

> ### b)   *Analysis*

The term "centralized control unit" is used consistently in the claims and is intended to have the same general meaning in each claim.  I find that the "centralized control unit" phrases are not subject to Section 112, ¶ 6.

There is a rebuttable presumption that Section 112, ¶ 6 does not apply because the claim does not recite the word "means."  *See Apex*, 325 F.3d at 1371.  The intrinsic evidence demonstrates that a POSITA would understand the term "centralized control unit" as a structural element.   The intrinsic evidence, including the claims containing the disputed term, describes functions of and the structural interactions between "other components" and the "centralized control unit."  *See, e.g.,* Dkt. 72-5 at 7 (showing a schematic of how the "centralized control unit" interacts with other components), 18 (21:49–52) ("centralized control unit coupled to . . . electric pumps [and] generators [and] configured to: monitor at least one of pressure and temperature of the . . . electric pumps"), 18 (21:65–67) ("centralized control unit is coupled to the  . . . electric pumps [and] generators via cabling or Ethernet").  This indicates that the term does refer to a definite structure and is not subject to Section 112, ¶ 6.  *See Linear Tech. Corp.*, 379 F.3d at 1319–21 (finding that "circuit [for performing a function]" was sufficiently definite structure because the claim recited the "objectives and operations" of the circuit); *Smartflash*, 2015 WL 4208754, at *3 (When a claim includes "substantial additional language describing the

operation of the components at issue and their interaction with other components," the claim is generally not subject to Section 112, ¶ 6.).

Likewise, the specification further indicates that a POSITA would understand the "centralized control unit" has a definite structure.  In one embodiment, the "centralized control unit" is disclosed as a "data van."[4]  The '278 Patent specification describes the "data van" in structural terms, identifies some of the structural components of the "data van," and describes the physical interactions between the "data van" and other structural elements as follows:

> Monitor/control data van 40 can be mounted on a control vehicle 42, and connected to the pumps 10, electric motors 14, blenders 34, and other surface and/or downhole sensors and tools (not shown) to provide information to an operator, and to allow the operator to control different parameters of the fracturing operation.  For example, the monitor/control data van 40 can include a computer console that controls the VFD, and thus the speed of the electric motor 14 and the pump 10.  Other pump control and data monitoring equipment can include pump throttles, a pump VFD fault indicator with a reset, a general fault indicator with a reset, a main emergency "E-stop," a programmable logic controller for local control, and a graphics panel.  The graphics panel can include, for example, a touchscreen interface.

> The monitor/control data van 40 incorporate[s] various functions in a centralized location such that compressors and turbines spread across a plurality of trucks can be monitored by a single operator. . . .  Sensors for monitoring pressure, temperature, fluid rate, fluid density, etc. may be selected as design considerations well within the understanding of one of ordinary skill in the art.

> . . .  The monitor/control data van 40 can be placed in a trailer, skid, or body load truck.

> The monitor/control data van 40 further includes an Emergency Power

---

[4] The quoted passage from the '278 Patent below makes clear that the "monitor/control data van" is the "centralized control unit" because they are both recited as performing the same functions.  *See* Dkt. 72-5 at 10 (5:7–62).

> Off (EPO) 43 functionality, which allows for the entire site to be shut off completely. . . . Additional controls may include, for example, the pumps, the blender, the hydration, and the fracturing units. The signals for such controls can include, for example, on/off, speed control, and an automatic over-pressure trip. In the case of an over-pressure event, the operator controlled push button for the on/off signal can be deployed.

Dkt. 72-5 at 10 (5:7–62). In addition, Figure 1 of the '278 Patent illustrates the "data van 40" mounted on the "control vehicle 42." *See id.* at 5. Accordingly, the intrinsic evidence shows the term "centralized control unit" conveys structure to a POSITA.

Defendants argue that the term "unit" is a nonce word and reflects nothing about the structure of the device itself. Defendants cite to cases where courts have found other terms containing the word "unit" to be subject to Section 112, ¶ 6. *See* Dkt. 78 at 31–32 (citing *Diebold Nixdorf, Inc. v. Int'l Trade Comm'n*, 899 F.3d 1291, 1297 (Fed. Cir. 2018) and *Va. Innovation Sci., Inc. v. Amazon.com, Inc.*, No. 4:18-CV-474, 2019 WL 4259020, at *24 (E.D. Tex. Sept. 9, 2019)). However, these cases only confirm that the use of the word "unit" is not dispositive, and that Defendants must show by a preponderance of the evidence that the term "centralized control unit" would not be "understood by persons of ordinary skill in the art to have a sufficient definite meaning as the name for structure." *Fisher-Rosemount*, 2019 WL 6830806, at *3 (quoting *MTD Prods. Inc. v. Iancu*, 933 F.3d 1336, 1341 (Fed. Cir. 2019)). There is nothing about the use of the word "unit" that automatically subjects a claim term to means-plus-function treatment, especially in this context where "centralized control" is used to modify "unit." Indeed, a number of courts have construed "unit" without finding that it was subject to Section 112, ¶ 6. *See Samsung Elecs. Am., Inc. v. Prisua Eng'g Corp.*, 948 F.3d 1342, 1354 (Fed. Cir. 2020) (finding that

"digital processing unit" was not a means-plus function term); *Maxell Ltd. v. Huawei Device USA Inc.*, 297 F. Supp. 3d 668, 733 (E.D. Tex. 2018) (finding that "display unit" was not a means-plus-function term); *St. Clair Intellectual Prop. Consultants v. Matsushita Elec. Indus. Co.*, 691 F. Supp. 2d 538, 557–58 (D. Del. 2009) (finding that "image pick-up unit" was not a means-plus-function term).

Defendants have failed to point to any intrinsic or extrinsic evidence to fulfill their burden.  Dr. Schaaf opines that the term "centralized control unit" refers to "a physical unit from which operators can control and monitor equipment that is distributed across a hydraulic fracturing site from a single location," and "a [POSITA] would clearly understand [the term] to denote[] such structure."  Dkt. 72-9 at 25, ¶ 66.  Defendants' expert does not opine on the issue.  Thus, the extrinsic evidence is consistent with the intrinsic evidence and indicates that "centralized control unit" denotes a definite structure as well as the intrinsic evidence.

Defendants further argue that the "data van" is merely where the functions are performed, not the structure that performs those functions.  Defendants cite *Noah Systems, Inc. v. Intuit Inc.*, 675 F.3d 1302, 1317 (Fed. Cir. 2012) for the proposition that knowing where the functions are performed says nothing about the structure that performs those functions.  *Noah Systems* is distinguishable from the current case.  In *Noah Systems*, the alleged "structure" was a reference to a certain location in one of the figures portraying an embodiment.  *See* 675 F.3d at 1316–17 ("As indicated above, a careful reading of the specification indicates that such software would be implemented inside box 44 in Figure 1.  The portions of the specification that describe what occurs inside box 44, however,

merely recite functional, not structural, language."). The Federal Circuit found that, although a location at which the function would be performed was disclosed in the associated figures, the term was still indefinite because the specification contained no description of the structure that performed the function at the described location. *See id.* Similarly, the '278 Patent specification discloses the location of the "centralized control unit" in the associated figures. *See* Dkt. 72-5 at 5 (Fig. 1, "40"), 6 (Fig. 2, "140"). However, the specification also discloses the data van as being the structure at the locations indicated in the associated figures. *See id.* at 10 (5:21–22) ("The monitor/control data van **40** [the location in Fig. 1] incorporate[s] various functions in a centralized location.") (emphasis added). Thus, unlike *Noah Systems,* a structure that performs the functions at the location specified in the associated figures is disclosed.

In summary, the intrinsic and extrinsic evidence shows that Defendants have failed to overcome the presumption that the claimed "centralized control unit" is not a means-plus-function limitation. Consequently, I find that the "centralized control unit" phrases are not subject to Section 112, ¶ 6.

9.      "**capable of pumping the hydraulic fracturing fluid at high pressure to crack the formation so that the fracturing fluid enters and cracks the formation**" / "**configured to pump fluid [at high pressure] into [the/a] wellbore [at high pressure] [that intersects the formation] so that the fluid passes from the wellbore into the formation, and fractures the formation**" ('410 Patent Claims 1 and 10; '601 Patent Claims 1 and 8; '278 Patent Claims 1 and 9; '308 Patent Claim 1; '728 Patent Claim 1)

| Disputed Terms | USWS's Proposal | Defendants' Proposal |
|---|---|---|
| "capable of pumping the hydraulic fracturing fluid at high pressure to crack the formation so that the fracturing fluid enters and cracks the formation" (Dkts. 72-2 at 11 (9:39–41); 72-3 at 8 (8:1–2); 72-5 at 18 (22:19–21))<br><br>"configured to pump fluid [at high pressure] into [the/a] wellbore [at  high pressure] [that intersects the formation] so that the fluid passes from the wellbore into the formation, and fractures the formation" (Dkts. 72-2 at 11 (9:6–8); 72-3 at 8 (7:25–28); 72-4 at 12 (8:25–28); 72-5 at 18 (21:43–45); 72-6 at 11 (8:6–8)) | Not indefinite/plain and ordinary meaning. | Indefinite |

### a)    *The Parties' Positions*

Defendants contend that all Asserted Claims of the '410 Patent, the '601 Patent, the '278 Patent, and the '308 Patent, and Claims 1–6 of the '728 Patent are indefinite because they have a scope that varies depending on the application.  Defendants argue that these claims require a system with pumps that are configured to pump fluid at high pressure so that the fluid actually fractures the rock formation where the system is being used. Defendants assert, based on the opinion of Dr. Wooley, that there are too many variables involved in determining whether a particular hypothetical system is capable of fracturing

a particular formation.

Citing *Halliburton Energy Services v. M-I LLC*, 514 F.3d 1244, 1253 (Fed. Cir. 2008), Defendants contend that there is no possible way that one skilled in the art can look at a system and determine whether it infringes the asserted claims.   According to Defendants, a POSITA would need to have an enormous volume of additional information about the rock formation in question, as well as other aspects of the well and various environmental factors, to know whether a system is configured to fracture or capable of cracking a particular formation.   The question of whether a particular system infringed these claims, Defendants aver, would change depending on where and how it was used.

Defendants posit that the term "high pressure" is inherently subjective and has no specific meaning in the art.   They maintain that one person skilled in the art could interpret "high pressure" to mean something entirely different from another person skilled in the art, even for the same application.   Defendants further argue that "high pressure" cannot mean whatever is adequate to fracture the formation because the answer to that question varies depending on a multitude of factors.

USWS responds that the claims require the pumps to be hydraulic fracturing pumps. USWS contends that the claim language does not require the systems to be used for hydraulic fracturing applications.   USWS contends that *Halliburton* is distinguishable because, in *Halliburton*, the disputed claim language described the improvement over prior art—the point of novelty—but the claim language at issue here is not at the point of novelty.   Based on Dr. Schaaf's opinion, USWS argues that a POSITA would recognize the claim language at issue in this case simply reflects a prior art description of hydraulic

fracturing from the specification and requires the pumps to be used for hydraulic fracturing.

USWS also argues that Defendants and Dr. Wooley fail to cite the specification and rely exclusively upon the language of this claim term in the abstract. USWS contends that Defendants' argument that "high pressure" is a term of degree fails for the same reason. According to USWS, the requisite "standard for measuring the term of degree" is set forth by the description of hydraulic fracturing that Defendants have ignored. Dkt. 90 at 15 (quoting *Exmark* , 879 F.3d at 1346).

USWS argues that a POSITA would have no difficulty understanding whether a particular hydraulic fracturing system infringes the claims. USWS further argues that no reference to downhole conditions is needed to determine if a system would infringe. But even assuming it were necessary to reference downhole conditions, USWS contends, based on Dr. Schaaf's opinion, that "a POSITA can determine the required amount of pumping horsepower before moving equipment to a well-site to perform a hydraulic fracturing job." *Id.* at 18 (quoting Dkt. 90-9 at 4, ¶ 9).

Defendants reply that the *Halliburton* court noted that the limitation in question related to an alleged point of novelty over the prior art, but the Federal Circuit has never suggested that such a relationship is necessary for a finding of indefiniteness. According to Defendants, a patentee is not free to claim his or her invention using claim language of variable scope regardless of whether the language relates to the point of novelty.

Finally, Defendants argue that the fundamental principle is whether the same system can be evaluated for infringement without reference to the circumstances under which it is going to be used. Defendants explain that the asserted claims should have been drafted so

that they were not dependent on the downhole conditions at the location of use.  According to Defendants, the claims are indefinite because the scope of the claims expressly depends on whether fracturing actually occurs within the downhole formation, and the answer to that question varies from one formation to the next.

### b)    Analysis

I disagree with Defendants' arguments and find that the claims are not indefinite.

Excluding claim 9 of the '278 Patent, all of the relevant claims are system claims that generally recite a pump "capable of" or "configured to" operate in a described mode. The Federal Circuit has noted that "it is hardly uncommon for an apparatus or system claim, as a claim to a product rather a process (or a forbidden mix), to be directed to capability, instead of actual operation." *Chrimar Holding Co., LLC v. ALE USA Inc.*, 732 F. App'x 876, 885 (Fed. Cir. 2018).  Indeed, it is well established that "[c]laims are not per se indefinite merely because they contain functional language." *Cox Comm'ns., Inc. v. Sprint Comm'ns. Co. LP*, 838 F.3d 1224, 1232 (Fed. Cir. 2016).  *See also BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1366 (Fed. Cir. 2017) ("[N]othing in the law precludes, for indefiniteness, defining a particular claim term by its function." (internal quotation marks and citation omitted)).  The Federal Circuit has even noted that functional language can "promote[] definiteness because it helps bound the scope of the claims by specifying the operations" that a claim element must undertake.  *Cox Commc'ns*, 838 F.3d at 1232.

The system claims generally recite that the pump must be "capable of" or "configured to" pump hydraulic fracturing fluid at "high pressure" to crack the formation.

The intrinsic evidence indicates that "high pressure" means capable of pumping at 15,000 psi or more.  *See* Dkt. 72-4 at 10 (4:42–56) ("The pressure of the slurry can be increased up to around 15,000 psi by pump system . . . [and] then pumped into the wellbore for fracturing the formation." (references omitted)).   Accordingly, a POSITA would understand that the recited pump must be capable of pumping the fluid to at least 15,000 psi to infringe the system claims.  Indeed, the Federal Circuit has held that "to infringe a claim that recites capability and not actual operation, an accused device need only be capable of operating in the described mode." *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1204 (Fed. Cir. 2010) (internal quotation marks and citation omitted).  Contrary to Defendants' contention, the system claims are not dependent on all the variables of the formation, but instead only depend on the capability of the recited pump.[5]

Turning to the remaining claim, claim 9 of the '278 Patent is a method claim that states, "pumping fracturing fluid into a well in a formation with an electrically powered pump at a high pressure so that the fracturing fluid enters and cracks the formation."  Dkt. 72-5 at 18 (22:19–21).  A method claim is only infringed when all of the recited steps are actually performed.  *See Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1025 (Fed. Cir. 2015).  Here, claim 9 requires pumping the fluid into a well formation "so that the fracturing fluid enters and cracks the formation."  Dkt. 72-5 at 18 (22:20–21).

---

[5] To the extent that USWS contends I unduly narrow or limit the term to a single embodiment, I disagree.   Indeed, my analysis avoids the error USWS contends Defendants make, which is "relying exclusively upon the language of this claim term in the abstract." Dkt. 90 at 14.  Instead, the intrinsic record here "provides the technological and temporal context to enable the court to ascertain the meaning of the claim to one of ordinary skill in the art at the time of invention."  *V-Formation, Inc. v. Benetton Grp. SpA*, 401 F.3d 1307, 1310 (Fed. Cir. 2005).

Contrary to Defendants' contention, claim 9 is not indefinite simply because the method may be performed in different locations under different conditions.  Instead, infringement of claim 9 will always depend on how the system is used.  In other words, the claim will be infringed only if a system is actually used in such a way that "the fracturing fluid enters and cracks the formation."  *Id.*  Accordingly, Defendants have failed to show by clear and convincing evidence that the claim language is indefinite.

In light of the intrinsic and extrinsic evidence, I find that the phrases, "capable of pumping the hydraulic fracturing fluid at high pressure to crack the formation so that the fracturing fluid enters and cracks the formation" and "configured to pump fluid [at high pressure] into [the/a] wellbore [at high pressure] [that intersects the formation] so that the fluid passes from the wellbore into the formation, and fractures the formation," are not indefinite.  I further construe the term "high pressure" to mean capable of pumping at 15,000 psi or more.

### 10. "frequently" ('410 Patent Claim 1 and 10; '601 Patent Claim 1 and 8; '728 Patent Claim 1)

| Disputed Term | USWS's Proposal | Defendants' Proposal |
|---|---|---|
| "frequently" (Dkts. 72-2 at 11 (9:11); 72-3 at 8 (7:31; 8:8); 72-4 at 12 (8:31)) | Not indefinite/plain and ordinary meaning.<br><br>In the alternative, the term may be construed as "frequently (that is, at least once after the application of power or with each start)." | Indefinite |

#### a) *The Parties' Positions*

Defendants contend that the written description of the Asserted Patents fails to provide sufficient guidance concerning what qualifies as "frequently" performing motor

diagnostics.   Defendants argue that there is no disclosure of how "frequently" the diagnostics must be performed in order to fall within the scope of the claims.  Defendants contend that "frequently" is a subjective "word of degree."

Defendants explain that the specification only provides a single example of what "frequently" means.  Defendants contend that a single isolated example is insufficient to provide an objective standard for determining the scope of these claims.  Defendants argue that without an objective anchor provided in the specification, "frequently" is a purely subjective term with a meaning dependent on the opinion of the particular individual applying it.

USWS responds that "frequently" is not purely subjective "because the term does not implicate matters of individual taste or preference."  Dkt. 90 at 19.  USWS contends that the intrinsic evidence offers ample guidance for a POSITA to determine the frequency at which diagnostics are performed.  USWS further contends that Dr. Wooley's testimony "ignores the boundaries established by the 'e.g.' disclosure."  *Id.*  (citing Dkt. 73-2 at 27–29, ¶¶ 54–57).  According to USWS, Dr. Schaaf provides a well-reasoned opinion that considers the relevant context of the claimed invention.

USWS claims that the specification discloses at least one objective boundary, and that the surrounding disclosures from the specification provide additional points of comparison that Dr. Schaaf relied upon to determine the scope of the term.  According to USWS, the intrinsic and extrinsic evidence supports its position and the four conclusory paragraphs from Dr. Wooley's declaration cannot represent the clear and convincing evidence required to invalidate the claims.

Defendants argue that the claims in question are indefinite because the Asserted Patents provide only a single example with no guidelines as to what qualifies as "frequently." Defendants contend that USWS and Dr. Schaaf have made no effort to rebut the fact that "[t]he meaning of this term in this context is simply a matter of personal opinion that will vary from one person to the next." Dkt. 94 at 10 (quoting Dkt. 73-2 at 28, ¶ 56). Defendants also argue that USWS has failed to identify any case in which a single example in the specification was held sufficient to provide an objective standard for measuring an otherwise subjective claim term.

### b)   *Analysis*

I find that the term "frequently" is not indefinite. Defendants contend that the term is indefinite because there is no disclosure of how "frequently" the diagnostics must be performed in order to fall within the scope of the claims. I disagree.

"Frequently" is the type of claim term that is often referred to as a "term of degree." Terms of degree or approximations are not inherently indefinite. *See Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370 (Fed. Cir. 2014) ("[A]bsolute or mathematical precision is not required."). Rather, "[a]ll that is required is some standard for measuring the term of degree." *Exmark*, 879 F.3d at 1346. *See also DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1260 (Fed. Cir. 2014) ("[S]pecific and unequivocal examples may be sufficient to provide a skilled artisan with clear notice of what is claimed" for terms of degree.); *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1336 (Fed. Cir. 2010) (holding that "not interfering substantially" is sufficiently definite because one of skill in the art could use "the examples in the specification to determine whether

interference with hybridization is substantial").

Here, the specification provides a standard for measuring the meaning of the term "frequently."   Specifically, the specification states that "motor diagnostics can be performed frequently (e.g., on the application of power, or with each start)."  Dkt. 72-3 at 6 (3:66–67).  I interpret the language of "with each start" as an alternative way of stating "on the application of power."  In other words, they are the same event.  Thus, to avoid confusing the jury, I construe "frequently" to mean "at least with each start."

Turning to Defendants' arguments, I find that the specification provides "objective boundaries" for the term "frequently."  *Interval Licensing*, 766 F.3d at 1371 (A term of degree is not indefinite when "[t]he claims, . . . read in light of the specification and the prosecution history, . . . provide objective boundaries for those of skill in the art.").  *See also Nautilus*, 572 U.S. at 910 ("[A] patent's claims, viewed in light of the specification and prosecution history, [must] inform those skilled in the art about the scope of the invention with reasonable certainty.").  Specifically, a POSITA would understand with reasonable certainty that "frequently" means "at least with each start."  In other words, any system that is incapable of performing the diagnostics at least with each start would not fall within the scope of the claims.  Accordingly, I find that Defendants have failed to show by clear and convincing evidence that the claim language is indefinite.  *See Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1359 (Fed. Cir. 2012) ("This court has repeatedly confirmed that relative terms such as 'substantially' do not render patent claims so unclear as to prevent a person of skill in the art from ascertaining the scope of the claim.").

In light of the intrinsic and extrinsic evidence, I find that the term "frequently" is

not indefinite, and I construe the term to mean "at least with each start."

**11.    "high-strength steel or steel alloy" ('410 Patent Claim 10; '601 Patent Claim 8)**

| Disputed Term | USWS's Proposal | Defendants' Proposal |
|---|---|---|
| "high-strength steel or steel alloy" (Dkts. 72-2 at 11 (9:42); 72-3 at 8 (8:3)) | Not indefinite/plain and ordinary meaning. | Indefinite |

### a)    *The Parties' Positions*

Defendants contend that the term is indefinite because there is no specific meaning of the term "high-strength steel or steel alloy" in the art, the term is a subjective word of degree, and the boundaries of the term cannot be discerned from the intrinsic evidence. Defendants argue that the single example of "high-strength" steel in the specification, 4340 steel, is insufficient and fails to inform one skilled in the art of the types or grades of steel that would meet the requirement of being "high-strength."  Defendants further argue that Dr. Schaaf admits that "high-strength" does not denote a specific degree of mechanical strength.  Defendants contend that a person of ordinary skill would not recognize "high-strength" steel as a clearly defined term of art in the oil and gas industry.

USWS responds that Dr. Schaaf offers well-supported testimony showing "the phrase 'high-strength' does not define a specific threshold [of] mechanical strength," but instead denotes that methods "have been applied to improve the mechanical properties of standard carbon steel."  Dkt. 90 at 21 (quoting Dkt. 73-3 at 45, ¶ 107).  USWS asserts that Dr. Schaaf's understanding is supported by definitions from trade dictionaries in the oil and gas industry.  USWS explains that "high-strength" is not a term of degree at all because

"high-strength" simply denotes that heat treatment methods have been applied to standard steel to increase the strength of the steel. USWS also argues that Defendants' reliance on a claim differentiation argument is at odds with the specification, which it contends describes a "high strength 4340 alloy steel shaft." *Id.* at 22 (quoting Dkt. 72-3 at 6 (3:50–53)). Finally, USWS contends that Defendants have not proffered clear and convincing evidence for a finding of indefiniteness.

Defendants reply that Dr. Schaaf's opinion that "high-strength" simply means that any "methods (e.g. heat treatment)" have been applied to standard steel is a sweeping generalization without any support in the record that would essentially eliminate this language as a claim limitation. Dkt. 94 at 12 (quoting Dkt. 73-3 at 45, ¶ 107) (emphasis omitted). Defendants argue that the specifications provide only a single example of what should be considered "high-strength," and that USWS concedes that the claims are not limited to that one example. According to Defendants, the claims including this term are indefinite because the Asserted Patents fail to provide any objective boundaries.

### b)   *Analysis*

I find that the term, "high-strength steel or steel alloy," is used consistently in the claims and is intended to have the same general meaning in each claim. I further find that the disputed term, "high-strength steel or steel alloy," when "read in light of the specification delineating the patent and the prosecution history, fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus*, 572 U.S. at 901.

Dr. Schaaf opines that "[t]he intrinsic record supports the position that 'high-

strength' does not denote a specific degree of mechanical strength." Dkt. 73-3 at 46, ¶ 110.

Dr. Schaaf explains that the mechanical strength of the one exemplary material disclosed in the specification (*i.e.*, 4340 alloy steel) "can vary based on heat treatment." *Id.* Dr. Schaaf contends that "it would be unreasonable to identify a specific threshold for mechanical strength." *Id.* at 45, ¶ 108. I disagree and find that the intrinsic evidence indicates that "high-strength" does refer to a specific threshold on a gradient scale of mechanical strength.

Although a specific degree of precision is not required, the "patent's claims, viewed in light of the specification and prosecution history, [must] inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus*, 572 U.S. at 910. Here, the term "high-strength steel or steel alloy" is intended to further limit the type of material used for the drive shaft. When considered in the context of the intrinsic evidence, the term "high strength" relates to the mechanical strength of the shaft given its function and the operating environment. Indeed, the specification states that "[i]n some embodiments, the electric motor can include a single shaft extension and huh [sic] for *high tension radial loads*, and *a high strength* 4340 alloy steel shaft, although other suitable materials can also be used." Dkt. 72-3 at 6 (3:50–53) (emphasis added and reference omitted). Thus, contrary to Dr. Schaaf's opinion, a POSITA would understand that "high-strength" is intended to refer to some threshold for mechanical strength that is able to handle the "high tension radial loads." One of the extrinsic dictionary definitions cited by Dr. Schaaf supports my conclusion by defining "high-strength low-alloy steel" as "*having higher strength*, better low-temperature impact toughness, and, in some grades, better

atmospheric corrosion resistance than carbon steel." Dkt. 73-3 at 45–46, ¶ 109 (emphasis added).  Accordingly, I do not agree that the intrinsic and extrinsic evidence indicates that "high-strength" is unrelated to a threshold for mechanical strength of the material.

Moreover, Dr. Schaaf's opinion that "high-strength" simply means that "methods (e.g. heat treatment)" have been applied to standard steel is a sweeping generalization without any support in the intrinsic or extrinsic record.  Dkt. 73-3 at 45, ¶ 107.  Adopting such interpretation would arguably categorize any steel as "high-strength" steel besides standard carbon steel if any method was applied to it to change its properties. Consequently, the "high-strength" steel limitation would almost entirely be read out of the claims and the breadth of the term would be so broad that the scope of the invention could no longer be determined with reasonable certainty.  "While patentees are allowed to claim their inventions broadly, they must do so in a way that distinctly identifies the boundaries of their claims."  *Halliburton*, 514 F.3d at 1253.  Similar to the patentee in *Halliburton*, USWS asks me to "resolve the ambiguity in a way that gives it the broadest possible construction . . . ; [but] such a construction would undermine the notice function of the claims because it would allow [USWS] to benefit from the ambiguity, rather than requiring [USWS] to give proper notice of the scope of the claims to competitors."  *Id.* at 1254.

The 4340 steel example potentially could have provided an objective boundary for the term "high-strength steel or alloy steel."[6]  *See Interval Licensing*, 766 F.3d at 1371 (In

---

[6] The claim language confirms that "high-strength" is broader than the one example provided in the specification because dependent claim 16 of the '410 Patent expressly requires the use of 4340 alloy steel.  This indicates that "high-strength," as used in independent claim 10 of the same patent, is not limited to that one particular alloy under the doctrine of claim differentiation.  *See Nazomi*

order to find a term of degree is not indefinite, "[t]he claims, when read in light of the specification and the prosecution history, must provide objective boundaries for those of skill in the art.").  The extrinsic evidence indicates that the strength levels of tempered 4340 alloy steel can vary between 125 ksi to 280 ksi.  *See* Dkt. 72-9 at 226.  However, this evidence does not provide objective boundaries given that Plaintiff explicitly argues that "'high-strength' does not define a specific threshold [of] mechanical strength."  Dkt. 90 at 21 (quoting Dkt. 73-3 at 46, ¶ 110.).  Consequently, the 4340 example fails to inform one skilled in the art, with reasonable certainty, of the scope of the invention.  Because "high-strength" is a subjective word of degree under USWS's overly broad interpretation, I find that the claims are invalid as indefinite.

In light of the intrinsic and extrinsic evidence, I find that the term "high-strength steel or steel alloy" fails to inform one skilled in the art of the scope of the invention with reasonable certainty.  Accordingly, claim 10 of the '410 Patent and claim 8 of the '601 Patent are indefinite under Section 112, ¶ 2.

---

*Comm'ns, Inc. v. Arm Holdings, PLC*, 403 F.3d 1364, 1370 (Fed. Cir. 2005) ("The concept of claim differentiation normally means that limitations stated in dependent claims are not to be read into the independent claim from which they depend." (internal quotation marks and citation omitted)).

12. **"excessive heat" ('410 Patent Claim 9; '601 Patent Claim 16; '308 Patent Claim 6)**

| Disputed Term | USWS's Proposal | Defendants' Proposal |
|---|---|---|
| "excessive heat" (Dkts. 72-2 at 11 (10:16); 72-3 at 8 (7:56); 72-6 at 11 (8:24)) | Not indefinite/plain and ordinary meaning.<br><br>In the alternative, the term may be construed as "heat that would damage the power semiconductors." | Indefinite |

### a) *The Parties' Positions*

Defendants argue that the claims are indefinite because there is no disclosure of what qualifies as "excessive heat." Defendants contend that the claims refer to "excessive heat" as what causes "damage" to "one or more power semiconductor heat sinks." Dkt. 73-1 at 22. Defendants argue that the qualifier that "excessive heat" is what causes "damage" to the heat sink does not provide reasonable certainty because the concept of "damage" in this context is subjective and it is not clear what diminution in heat transferring capabilities would constitute "damage."

USWS responds that the specification provides a POSITA with reasonable certainty about the scope of the term. USWS contends that the specification discusses the claim language as a reliability measure that can be implemented by the VFD. This disclosure sets an objective boundary that reveals the scope of damage that the VFD is designed to prevent. According to USWS, the "power semiconductor heat sinks having one or more thermal sensors monitored by a microprocessor" is a structure designed to prevent damage that decreases the reliability of hydraulic fracturing operations. Dkt. 90 at 23 (quoting Dkt. 72-3 at 6 (3:54–62)). USWS contends that this is a case where functional language

promotes, rather than obstructs, definiteness.

Based on Dr. Wooley's opinion, Defendants contend that "the concept of 'damage' in this context is itself inherently subjective" and the Asserted Patents do not provide any objective standard by which one of skill in the art could reliably determine whether a particular level of heat qualifies as "excessive." Dkt. 94 at 17 (quoting Dkt. 73-2 at 30, ¶ 63). Defendants explain that Dr. Schaaf stated that "the term 'excessive heat' refers to an amount of heat that exceeds the threshold level suitable for the particular system under the given operating conditions." *Id.* (quoting Dkt. 73-3 at 39–40, ¶ 95) (emphasis omitted). Defendants contend, however, that Dr. Schaaf made no effort to explain this statement, and the Asserted Patents do not introduce the concept of a "suitable" level of heat.

### b)   Analysis

I find that the term "excessive heat" is used consistently in the claims and is intended to have the same general meaning in each claim. I further find that the term "excessive heat" is used in the context of an additional capability of the VFD. For example, claim 9 of the '410 Patent recites "wherein the variable frequency drive has one or more power semiconductor heat sinks having thermal sensors monitored by a microprocessor to prevent damage caused by excessive heat." Dkt. 72-3 at 8 (7:53–56). As discussed above, the Federal Circuit held that "to infringe a claim that recites capability and not actual operation, an accused device need only be capable of operating in the described mode." *Finjan*, 626 F.3d at 1204 ( internal quotation marks and citation omitted). Here, the claim language indicates that the VFD must have the capability to monitor the temperature of the heat sink. Specifically, the VFD has this capability via the recited thermal sensors.

Indeed, the specification discusses the claim language as a reliability measure that can be implemented by the VFD:

> The VFD can be designed to maximize the flexibility, robustness, serviceability, and reliability required by oilfield applications, such as hydraulic fracturing.  For example, . . . the VFD can include . . . power semiconductor heat sinks having one or more thermal sensors monitored by a microprocessor to prevent semiconductor damage caused by excessive heat.

Dkt. 72-3 at 6 (3:54–62).  This disclosure confirms that it is the thermal sensors that provide the VFD with the capability of preventing damage caused by excessive heat.

Defendants argue that this ignores the question of what constitutes "damage," or what is a "suitable" level of heat.  I find that Defendants' questions miss the mark.  All of the claims at issue are dependent claims that recite adding thermal sensors in order to enable an additional capability of the VFD.  The claims at issue provide an objective standard by reciting the capability of the VFD, which is enabled via the recited thermal sensors.  In other words, the VFD must include "semiconductor heat sinks having thermal sensors" so that it is capable of monitoring the temperature of the heat sinks.

In light of the intrinsic and extrinsic evidence, I find that the term "excessive heat" is not indefinite.

### 13. "performs/performing electric motor diagnostics" ('410 Patent Claims 1 and 10; '601 Patent Claims 1 and 8; '728 Patent Claims 1 and 7)

| Disputed Term | USWS's Proposal | Defendants' Proposal |
|---|---|---|
| "performs/performing electric motor diagnostics" (Dkts. 72-2 at 11 (9:12; 9:47); 72-3 at 8 (7:31–32; 8:8–9); Dkt. 72-4 at 12 (8:31–32; 8:66–67)) | Not indefinite/plain and ordinary meaning. | Indefinite for claiming an apparatus and a method of using the apparatus. |

#### a)   *The Parties' Positions*

The parties dispute whether these claims recite both an apparatus and a method of using that apparatus, and therefore are indefinite.  Defendants argue that the claims do not require that the VFD simply be "configured to" or "capable of" performing electric motor diagnostics, but instead require that a user must use the VFD to actually carry out the step of performing electric motor diagnostics.  As a result, one skilled in the art has no way to determine whether these claims are infringed when (a) a system with all of the required physical components is created; or when (b) the VFD within that system is used by an operator to actually carry out the required step of performing motor diagnostics.  Finally, Defendants assert that the use of the term "frequently" is more evidence that "performs/performing electric motor diagnostics" is directed to user actions, not just system capabilities.

USWS responds that the claims are not indefinite mixed method-apparatus claims because the functional language of the claims merely describes "the structure and capabilities of the claimed apparatus."  Dkt. 90 at 24 (quotation marks and citation omitted).  USWS argues that the court in *Motion Games* declined to apply the "very

limited" holding in *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377 (Fed. Cir. 2005) because "the language in [the claim] permissibly defines the processing means by its functionality of controlling a function." *Id.* at 25 (quoting *Motion Games, LLC v. Nintendo Co.*, No. 6:12-CV-878-JDL, 2015 WL 11170167, at *4 (E.D. Tex. Jan. 16, 2015)). USWS asserts that the Court should decline to apply the holding of *IPXL* to the term at issue here for the same reason.

### b)    *Analysis*

I find that the phrase, "performs/performing electric motor diagnostics," is used consistently in the claims and is intended to have the same general meaning in each claim. Defendants contend that these claims are indefinite because they recite both an apparatus and a method of using that apparatus. I disagree.

Under Section 112, ¶ 2, mixed method-apparatus claims are indefinite when it is unclear whether infringement occurs "when one creates a system that allows the user to [perform the step] . . . or . . . when the user actually [performs the step]." *IPXL*, 430 F.3d at 1384. It is understood that apparatus claims that are limited by functional language are not necessarily indefinite. *See Microprocessor Enhancement Corp. v. Tex. Instruments Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008). If an apparatus claim "is clearly limited to an apparatus possessing the recited structure and *capable* of performing the recited functions, then the claim is not invalid as indefinite." *UltimatePointer, L.L.C. v. Nintendo Co.*, 816 F.3d 816, 826 (Fed. Cir. 2016) (internal quotation marks, brackets, and citation omitted).

"Whether claim language is indefinite for improperly mixing claim forms depends on whether the language used is directed at user actions or system capabilities." *Motion*

*Games*, 2015 WL 11170167, at *4.  Defendants argue that the "frequently" limitation

confirms that the claims in question are directed to the actions of the user operating the

VFD.  I find that Defendants argument is inconsistent with the specification, which is not

directed to methods or user actions, but instead describes a capability of the VFD.  Unlike

the claims in *IPXL*, the claims do not recite that "the user uses" the VFD.  *IPXL*, 430 F.3d

at 1384 (finding that the term, "the user uses the [apparatus] to [perform a function],"

recited a method for using the apparatus, and, thus, the term was an indefinite method-

apparatus claim (emphasis and citation omitted)).  Instead, the disputed term—a VFD that

"frequently performs/performing electric motor diagnostics"—is much more comparable

to the terms at issue in *UltimatePointer*, *Motion Games*, and *Microprocessor*

*Enhancement*, each of which were found to recite a function or capability, not a method

for using the claimed apparatus.  *See UltimatePointer*, 816 F.3d at 826 (finding that the

term, "[apparatus] generating data," recited a capability or function, not a method for using

the apparatus, and, thus, the term was not an indefinite method-apparatus claim);

*Microprocessor Enhancement,* 520 F.3d at 1375 (finding that the term, "[apparatus]

performing a [function]," recited a capability or function, not a method for using the

apparatus, and, thus, the term was not an indefinite method-apparatus claim); *Motion*

*Games*, 2015 WL 11170167, at *4–5 (finding that the term, "[apparatus] controls a

function," recited a capability or function, not a method for using the apparatus, and, thus,

the term was not an indefinite method-apparatus claim).  These cases make clear that the

term at issue here does not indicate how a user would use the VFD, but instead indicates a

function or capability of the VFD.  *See UltimatePointer*, 816 F.3d at 828 ("[T]he claims

do not reflect an attempt to claim both an apparatus and a method [for using the apparatus], but instead claim an apparatus with particular capabilities."); *Motion Games*, 2015 WL 11170167, at *5 (holding that the disputed term was not an indefinite method-apparatus claim in part because "[t]he claim does not require that a user actually engage the apparatus as has been found to mix method and apparatus claim forms"). Accordingly, Defendants have failed to show by clear and convincing evidence that the claim language is indefinite.

I find that the phrase, "performs/performing electric motor diagnostics," does not mix an apparatus and a method, and therefore is not indefinite.

**14. "monitored by a microprocessor to prevent damage caused by excessive heat" ('410 Patent Claim 9; '601 Patent Claim 16; '308 Patent Claim 6)**

| Disputed Term | USWS's Proposal | Defendants' Proposal |
|---|---|---|
| "monitored by a microprocessor to prevent damage caused by excessive heat" (Dkts. 72-2 at 11 (10:14–15); 72-3 at 8 (7:55–56); 72-6 at 11 (8:23–24)) | Not indefinite/plain and ordinary meaning. | Indefinite for claiming an apparatus and a method of using the apparatus. |

### a)    The Parties' Positions

The parties dispute whether these claims recite both an apparatus and a method of using that apparatus, and therefore are indefinite. Defendants contend these claims are unclear because they require not only a microprocessor that is capable of monitoring the thermal sensors, but also that the monitoring actually be performed. Accordingly, Defendants assert that these claims are indefinite because they recite both an apparatus and a method of using the apparatus.

USWS responds that none of these claims are mixed method-apparatus claims.

USWS argues that Defendants and Dr. Wooley ignore the specification, which USWS contends reveals that this claim language is directed to the capability or functionality of the VFD, not a method for using the VFD.  USWS further argues, based on Dr. Schaaf's opinion, that a POSITA would understand that this claim language is directed to capability.

### b)    *Analysis*

I find that the phrase, "monitored by a microprocessor to prevent damage caused by excessive heat," is used consistently in the claims and is intended to have the same general meaning in each claim.  The claims containing this term are not mixed method-apparatus claims for the same reasons identified above with respect to the VFD's capability of performing motor diagnostics.  In short, rather than being analogous to the term at issue in *IPXL*, the disputed term—"monitoring by a microprocessor to prevent damage"—is much more comparable to the terms at issue in *UltimatePointer*, *Motion Games*, and *Microprocessor Enhancement*, each of which were found to recite a function or capability, not a method for using the claimed apparatus.  *See UltimatePointer*, 816 F.3d at 826; *Microprocessor Enhancement,* 520 F.3d at 1375; *IPXL*, 430 F.3d at 1384; *Motion Games*, 2015 WL 11170167, at *4–5.  The claims explicitly recite that the VFD includes a specific configuration of structures: "one or more power semiconductor heat sinks having thermal sensors monitored by a microprocessor to prevent damage caused by excessive heat."  Dkt. 72-3 at 8 (7:54–56).  Dr. Schaaf testifies that a POSITA would recognize that these structures have the capability of monitoring the power semiconductor heat sinks to protect the power semiconductors, and therefore the VFD, from heat damage.  *See* Dkt. 73-3 at 22–24, ¶¶ 63–64; 39–40, ¶ 95.  Thus, when considering the disputed term in its context, it

becomes clear that a POSITA would recognize that the disputed term is not referring to how a user would use the structure but instead is referring to a capability of the structure.

I find that the phrase "monitoring by a microprocessor to prevent damage caused by excessive heat" does not mix an apparatus and a method, and therefore is not indefinite.

## V.    THE SEVEN TERMS

In their Joint Claim Construction and Prehearing Statement, Defendants alleged that seven additional terms are indefinite (the "Seven Terms").  *See* Dkt. 57-2 at 17–19.  As a result, USWS raised and addressed the Seven Terms in its initial claim construction brief.  *See* Dkt. 72 at 30–31.  Defendants chose to ignore USWS's arguments, failing to address these terms in either their responsive claim construction brief or in their subsequent Motion.  Nevertheless, Defendants indicated during the Markman hearing that they intend to file an additional motion for summary judgment asserting that the Seven Terms are indefinite.

Defendants are not permitted to file an additional motion for summary judgment concerning the Seven Terms because they waived their arguments concerning those terms by failing to address them during the claim construction phase.  The Federal Circuit has held that an accused infringer waives any argument with respect to the construction of a claim term when it fails to raise that issue during the claim construction phase of a patent infringement action.  *See Cent. Admixture Pharmacy Servs., Inc. v. Advanced Cardiac Sols., P.C.*, 482 F.3d 1347, 1356 (Fed. Cir. 2007) ("The district court found that [the defendant] waived any argument with respect to this term by failing to raise it during the claim construction phase.  We agree.").  Several district courts in Texas have concluded

the same.  *See Music Choice v. Stingray Dig. Grp. Inc.*, No. 216CV00586JRGRSP, 2019 WL 8110069, at *3 (E.D. Tex. Nov. 19, 2019) (denying "requests for additional claim construction where [the] party could have made arguments during the claim construction phase of the case but did not") (quotation marks, ellipses, and citation omitted); *Finalrod IP, LLC v. John Crane, Inc.*, No. 7:15-CV-00097-ADA, 2019 WL 4061703, at *2 (W.D. Tex. May 30, 2019) ("Defendants waived their indefiniteness argument regarding [the allegedly indefinite term] because they failed to raise it during the claim construction phase."); *Ericsson Inc. v. TCL Commc'n Tech. Holdings, Ltd.*, No. 2:15-CV-00011-RSP, 2017 WL 5137401, at *15 (E.D. Tex. Nov. 4, 2017), *rev'd on other grounds*, 955 F.3d 1317 (Fed. Cir. 2020) ("[F]ailure to timely raise . . . claim construction arguments should ordinarily result in waiver of the arguments."); *PerdiemCo, LLC. v. Industrack LLC*, No. 215CV00726JRGRSP, 2016 WL 6432699, at *3 (E.D. Tex. Oct. 31, 2016) (finding that a claim construction argument not raised during the claim construction phase was waived). One of these district courts even specifically held that a defendant waived its construction arguments when the defendant "did not oppose" the plaintiff's arguments concerning the disputed term's meaning, which is the precise situation in which the parties find themselves in this case.  *Ericsson*, 2017 WL 5137401, at *15.

Consequently, I find as part of the claim construction process that the Seven Terms are not indefinite.  Those Seven Terms are set forth on Appendix A.

## VI.   CONCLUSION

As set forth above, I have made certain claim construction findings and further recommend that the Motion be **GRANTED IN PART** and **DENIED IN PART** in

accordance with this Report and Recommendation and Order.  To be clear, I recommend the Motion be granted with respect to finding the "high-strength steel or steel alloy" term indefinite, but be denied in all other respects.  Appendix A summarizes my conclusions on both the claim construction and summary judgment issues.

The Clerk shall provide copies of this Report and Recommendation and Order to the respective parties who have fourteen days from the receipt thereof to file written objections to my recommendations pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002—l3.  Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

SIGNED in Galveston, Texas, this 18th day of September, 2020.

ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE

## APPENDIX A

| Term/Phrase | Order/Recommendation |
|---|---|
| "monitoring/monitor/monitored"<br><br>'410: claim 9;<br><br>'601: claim 16;<br><br>'278: claims 1, 3, 9, 12, 19, 23;<br><br>'308: claim 6 | Plain and ordinary meaning |
| "electric motor diagnostics"<br><br>'410: claims 1, 10;<br><br>'601: claims 1, 8;<br><br>'728: claims 1, 7 | Plain and ordinary meaning |
| "a first transformer for stepping down a voltage of electricity from an electrical source to a voltage that is useable by the pump, and a second transformer that steps down a voltage of the electricity useable by the pump to a voltage that is useable by the heater"<br><br>'728: claim 12 | Plain and ordinary meaning |

| | |
|---|---|
| "attached"<br><br>'410: claim 10;<br><br>'601: claim 8 | Plain and ordinary meaning |
| "coupled to"<br><br>'728: claim 7 | Plain and ordinary meaning |
| "electrically connected to the plurality of electric pumps to provide electrical power to the pumps"<br><br>'278: claim 1;<br><br>'410: claim 4;<br><br>'601: claim 1 | Plain and ordinary meaning |
| "A/C console and a variable frequency drive that controls the speed of the pump"<br><br>'410: claim 2 | This phrase is not subject to 35 U.S.C. § 112, ¶ 6 |
| "wherein the variable frequency drive has/includes … power semiconductor heat sinks having … thermal sensors monitored by a microprocessor to prevent [semiconductor] damage caused by excessive heat"<br><br>'410: claim 9;<br><br>'308: claim 6;<br><br>'601: claim 16 | This phrase is not subject to 35 U.S.C. § 112, ¶ 6 |

| | |
|---|---|
| "the centralized control unit is configured to: monitor at least one of pressure and temperature of the plurality of electric pumps and the plurality of generators"<br><br>'278: claim 1 | This phrase is not subject to 35 U.S.C. § 112, ¶ 6 |
| "[Wherein the centralized control unit is] further [configured/comprising] [to reset/resetting] a fault occurring in the variable frequency drive"<br><br>'278: claims 6, 15 | This phrase is not subject to 35 U.S.C. § 112, ¶ 6 |
| "Wherein the centralized control unit is configured to: monitor one or more operating characteristics of the electric powered fracturing fleet"<br><br>'278: claim 19 | This phrase is not subject to 35 U.S.C. § 112, ¶ 6 |
| "Wherein the centralized control unit is configured to: … control one or more operating characteristics of the electric powered fracturing fleet"<br><br>'278: claim 19 | This phrase is not subject to 35 U.S.C. § 112, ¶ 6 |

| | |
|---|---|
| "capable of pumping the hydraulic fracturing fluid at high pressure to crack the formation so that the fracturing fluid enters and cracks the formation"<br><br>"configured to pump fluid [at high pressure] into [the/a] wellbore [at high pressure] [that intersects the formation] so that the fluid passes from the wellbore into the formation, and fractures the formation"<br><br>'410: claims 1, 10;<br><br>'601: claims 1, 8;<br><br>'278: claims 1, 9;<br><br>'308: claim 1;<br><br>'728: claim 1 | Not indefinite<br><br>"high pressure" means "15,000 psi or more" |
| "frequently"<br><br>'410: claims 1, 10;<br><br>'601: claims 1, 8;<br><br>'728: claim 1 | Not indefinite<br><br>"frequently" means "at least with each start." |
| "high-strength steel or steel alloy"<br><br>'410: claim 10;<br><br>'601: claim 8 | Indefinite |
| "excessive heat"<br><br>'410: claim 9;<br><br>'601: claim 16;<br><br>'308: claim 6 | Not indefinite<br><br>Plain and ordinary meaning. |

| | |
|---|---|
| "performs/performing electric motor diagnostics"<br><br>'410: claims 1, 10;<br><br>'601: claims 1, 8;<br><br>'728: claims 1, 7 | Not indefinite<br><br>Plain and ordinary meaning. |
| "monitoring by a microprocessor to prevent damage caused by excessive heat"<br><br>'410: claim 9;<br><br>'601: claim 16;<br><br>'308: claim 6 | Not indefinite<br><br>Plain and ordinary meaning. |
| "to prevent damage to the…electric motor"<br><br>'410: claims 1, 10;<br><br>'601: claims 1, 8;<br><br>'728: claim 1 | Not indefinite<br><br>Waived |
| "if [it/they] become grounded or shorted"<br><br>'601: claims 1, 8 | Not indefinite<br><br>Waived |
| "can be ported from one well to another"<br><br>'410: claims 3, 7;<br><br>'601: claim 5;<br><br>'308: claim 4, 10 | Not indefinite<br><br>Waived |

| | |
|---|---|
| "pumps are moveable"<br><br>'728: claim 6 | Not indefinite<br><br>Waived |
| "mobile platforms"<br><br>'728: claim 6 | Not indefinite<br><br>Waived |
| "at least one of pressure and temperature of the [plurality of electric pumps and the plurality of generators]/[electrically powered pump and the generator]<br><br>'278: claims 1, 9 | Not indefinite<br><br>Waived |
| "an [underground/rock/subterranean] formation"<br><br>'410: claims 1, 10;<br><br>'601: claims 1, 8;<br><br>'278: claim 1;<br><br>'308: claim 1 | Not indefinite<br><br>Waived |